S. & M. Plumbing Co., Inc., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Harry Rosenblum and Frances Rosenblum, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 200–68, 366–68. Filed February 1, 1971.

*Saul Mildworm,* for the petitioner in docket No. 200–68.
*Murray Roth,* for the petitioners in docket No. 366–68.
*Rufus H. Leonard, Jr.,* for the respondent.

Sterrett, *Judge:* Respondent determined deficiencies in the Federal income tax of the petitioners in the amounts and for the calendar years set forth below:

| | | |
|---|---|---|
| S. & M. Plumbing Co., Inc., docket No. 200–68 ⎰ | 1962 | $15,529.55 |
| ⎱ | 1963 | 4,878.14 |
| Harry and Frances Rosemblum, docket No. 366–68 | 1964 | 13,170.09 |

Due to concessions by the petitioner in docket No. 200–68 and due to the failure of petitioners in docket No. 366–68 to offer proof concerning the respondent's determination of long-term capital gains incurred in the sale of a residence which we treat as a concession, the sole issue for our determination is whether certain amounts received by petitioner Harry Rosenblum represented ordinary income from a joint venture, in which case petitioner S. & M. Plumbing Co., Inc., was entitled to deductions for the amounts paid; as opposed to capital gain on the disposition of preferred stock, in which case S. & M. Plumbing Co., Inc., was not entitled to the deductions. These cases are consolidated for purposes of trial and opinion because the transactions at issue determine the tax consequences for all parties.

FINDINGS OF FACT

Some of the facts were stipulated. The stipulation, together with the exhibits attached thereto, are incorporated herein by this reference.

S. & M. Plumbing Co., Inc. (hereinafter referred to as S. & M. or the petitioner corporation), is a corporation organized under the laws of the State of New York; its principal office at the time of filing of the petition herein was in the Bronx, New York. S. & M. filed its Federal corporation income tax returns for 1962 and 1963 with the district director of internal revenue at Manhattan, New York.

Petitioners Harry Rosenblum and Frances Rosenblum (hereinafter referred to individually as Harry and Frances), husband and wife, resided in New York City, N.Y., at the time their petition was filed herein. They filed their joint Federal income tax return for 1964 with the district director of internal revenue at Manhattan, New York.

In June of 1962 S. & M. bid on two plumbing contracts for the Board of Education of the City of New York for plumbing work on junior high schools 68 and 78 in Brooklyn, New York. S. & M. was awarded the contracts. In order to perform these contracts Samuel Meyerson (hereinafter Meyerson), president of S. & M. was required by the board of education to furnish performance and payment bonds. S. & M. did not have sufficient capital to procure the necessary bonds, but the bonding company stated that it would issue bonds provided S. & M. obtain additional capital in the amount of $50,000 for use on the two aforementioned projects.

Through Max E. Greenberg (hereinafter referred to as Greenberg), who was the attorney for both parties at the time, Harry had tentatively agreed with S. & M. that he would advance the corporation $50,000 as a loan subordinated to the claims of the bonding company and the board of education. As consideration for the loan Harry was to share in the profits from the two projects to the extent of 50 percent, but in no event was his profit to be less than $40,000.

For reasons not specified by the parties, the board of education would not accept the proposed subordinate loan. The board required that the additional $50,000 be in the form of a capital contribution. S. & M. and Harry agreed that his investment in S. & M. would be in the form of preferred stock, although the board of education did not require the specific device of preferred stock. The form of investment was immaterial to the board, which would have accepted preferred stock, common stock, or a joint venture.

At an unspecified date in June of 1962, Harry and Ten Oaks Corp. entered into an agreement wherein Harry was to make available to Ten Oaks the sum of $50,000. Ten Oaks was to invest said amount in preferred stock of S. & M., which stock was to be issued in the name of

Ten Oaks. The agreement further provided that Ten Oaks would act as Harry's nominee "with the express understanding that the proceeds of such stock, when called, shall belong to Harry Rosenblum personally."

On June 29, 1962, S. & M. and Ten Oaks executed a written agreement concerning Harry's proposed investment. Pertinent parts of the agreement provided as follows:

WHEREAS Ten Oaks is willing to enter into a joint venture agreement relative solely [sic] to the performance of said two project [sic] and to enter into an arrangement in such form as will satisfy the requirements of the Board of Education

Now, THEREFORE, it is agreed as follows:

1. The parties hereby enter into a joint venture for the performance of the plumbing work on J.H.S. 68 Brooklyn and J.H.S. 78 Brooklyn.

2. The interest of the parties shall be 50% each except that S & M guarantees to Ten Oaks a minimum profit of Forty-thousand ($40,000.00) Dollars.

3. To effectuate the purposes hereof, Ten Oaks will promptly deposit in an account to be open [sic] in the name of S & M J.H.S. account at Federation Bank and Trust Co. 34th Street and 8th Avenue the sum of Fifty-thousand ($50,000.00) Dollars.

4. Said sum shall be a trust fund solely for the performance of said projects. All sums accuring [sic] on said projects shall be deposited only in said account and all obligations chargeable to such projects shall be paid solely from that account. Checks shall require two signatures, each party hereto to designate one of such signatures and S & M will appoint the designee of Ten Oaks to such office or position as to entitle him to so sign.

5. To comply with the requirements of the Board of Education, S & M will amend its certificate of incorporation so as to entitle it to issue preferred stock representing the Fifty-thousand ($50,000.00) Dollars deposited by Ten Oaks. Such preferred stock shall be non-voting and shall have a preference in the assets of S & M to the extent of Ninety-thousand ($90,000.00) Dollars, being the Fifty-thousand ($50,000.00) Dollars deposited as herein provided plus the minimum guaranteed profit of Forty-thousand ($40,000.00) Dollars.

6. S & M will so keep its books of account as to readily reflect the income and expense of performance of said project, which accounts shall at all reasonable business hours be open to inspection by Ten Oaks or its designee.

7. The expenses of performance of said projects shall be all subcontracts, labor, material, plant and equipment rented, bonds, insurance, taxes on labor and material, imposts, charges, legal fees, liabilities not secured by insurance and all other expenses and obligations incurred or suffered in and about the performance of said projects of a nature under sound accounting practices properly charged as a cost of performance, except that no overhead expenses or charges against the joint venture for central office expense of either party shall be allowed except that [there] shall be allowed 3% of said contracts for overhead and central office expense of S & M.

8. Since the issuance of stock equivalent to the fund deposited by Ten Oaks is in form to satisfy the requirements of the Board of Education, Ten Oaks shall not assign or encumber such stock and agrees not to do so. To assure compliance herewith, the shares to be issued will be deposited with Max E. Greenberg in escrow to be held by him to effectuate the purposes hereof.

9. Upon receipt of substantial completion payment after providing for and paying all costs disbursed or incurred for its performance and any and all other costs and charges ordinarily and usually charged as costs in performance, including payment of all claims not secured by insurance or providing proper reserves for any said claim which shall either have been brought or the bringing of which may be reasonably anticipated, and after providing reserves for any contingencies, if any, that shall be determined by the parties in their discretion to be necessary, there shall first be paid Ten Oaks Fifty-thousand ($50,000.00) Dollars; there shall then be paid to Ten Oaks Forty-thousand ($40,000.00) dollars; there shall then be paid to S & M the remaining sums by way of profits up to Forty-thousand ($40,000.00) dollars; the balance of profit, if any, shall be divided equally between the parties.

The agreement also provided that all disputes between the parties were to be "finally determined" by Greenberg.

Paragraphs numbered 3 and 4 of the above-quoted agreement were inserted in order to satisfy the bonding company that the proceeds of Harry's investment would be used only for the two specified contracts. In addition, these provisions gave Harry some control over his investment.

On June 29, 1962, Harry drew a check for $50,000 on the Commercial Bank of North America payable to Frances. Frances endorsed the check to the order of S. & M. S. & M. endorsed the check "for deposit S. & M. Plumbing Co., Inc."

On August 20, 1962, the shareholders and directors of S. & M. held a special meeting. Subsequent to this meeting, on August 22, 1962, S. & M. executed a Certificate of Amendment of Certificate of Incorporation pursuant to the New York Stock Corporation Law. This amendment authorized S. & M. to issue 1,000 shares of $100 par value, nonvoting, preferred stock. The amendment provided that this stock was to have an annual 10-percent cumulative dividend. Upon liquidation the shareholders were provided with priority over the common stockholders to the extent of $180 per share plus accumulated dividends. The stock was callable by the corporation upon 30 days' notice, 2 years after issuance, at $180 per share.

On August 24, 1962, S. & M. and Ten Oaks agreed to amend the agreement of June 29, 1962,[1] by providing that the amount of dividends payable to Ten Oaks with respect to the preferred stock would be limited to 50 percent of the profit from the two school projects. Ten Oaks agreed to assign any excess dividends to S. & M.

On August 27, 1962, a certificate evidencing 500 shares of the preferred stock of S. & M. was issued naming Ten Oaks as owner. The

---

[1] This agreement actually amended the Certificate of Amendment of the Certificate of Incorporation of S. & M. which had provided for an unlimited number of annual 10-percent dividends, not the agreement of June 29, 1962, which provided for a maximum profit to Harry of 50 percent.

certificate was never delivered to Ten Oaks but was held by Greenberg as escrowee.

Although the parties introduced bank statements covering only the period January 1963 to September 1964, it appears that the proceeds of the $50,000 invested by Harry were deposited in "S. & M. Plumbing Co. Inc. Jr. High School Account" No. 013–76539, Federation Bank & Trust Co., as per the contract of June 29, 1962; and that the construction projects proceeded as agreed. Checks were signed by Meyerson and Harry.

After the two school projects were substantially completed, but prior to actual completion, on August 18, 1964, S. & M. made payment by check to Harry of $90,000. On this date S. & M. and Ten Oaks released the escrowee, Greenberg, authorizing him to deliver the 500 shares of S. & M. preferred stock to Ten Oaks which thereupon delivered the said shares to S. & M. In addition, on August 18, 1964, Ten Oaks and S. & M. each executed a general release releasing the other from further liability.

Harry consented to accept $90,000 prior to completion of the construction projects and prior to final determination of the profits to be realized therefrom in order to avoid conflict with S. & M. Harry suspected that part of the proceeds of the special construction account had been used by S. & M. in unrelated projects but he was not willing to engage in controversy with the corporation. In view of the fact that Harry had cosigned checks drawn on the account and the fact that he was willing to accept a profit limited to $40,000, no accounting was undertaken.

On its Federal corporation income tax returns for 1962 and 1963 S. & M. deducted a part of the $40,000 profit paid to Harry; i.e., $29,864.51 and $9,381.04, respectively, as ordinary business expenses.

On their joint Federal income tax return for 1964 the petitioners treated $38,743.06 of the amount received from S. & M. as long-term capital gain.[2]

## OPINION

In this case the respondent occupies the position of a stakeholder and we are called upon to characterize the business relationship that existed between the petitioners in order to determine the tax consequences to them. If, as S. & M. and the respondent contend, S. & M. and Harry were joint venturers in the performance of certain plumbing contracts, then, as all parties agree, Harry was in receipt of ordinary income

---

[2] On their tax return the petitioners claimed a basis of $51,256.94. The respondent in his statutory notice did not raise any questions concerning this amount.

and S.&M. was entitled to deduct the amounts it paid him.[3] Conversely, if Harry was a preferred stockholder in S. & M. he was entitled to report the income he received as capital gain and S. & M. was not entitled to deduct the amounts paid.[4]

The question of whether the parties were joint venturers is essentially factual. In *Hyman Podell*, 55 T.C. 429 (1970), we found as an Ultimate Finding of Fact that a joint venture existed. See also *Fishback* v. *United States*, 215 F. Supp. 621, 625 (D. S.D. 1963). "The totality of the evidence and not just the written agreement[s] must be looked to in order to determine whether a joint venture was entered into." (Citations omitted.) *Fishback* v. *United States, supra* at 625.

Although each case is to be decided upon its own facts and circumstances it is well established that there are four basic attributes which are indicative of a joint venture: (1) A contract, express or implied, that a joint venture be formed; (2) the contribution of money, property and/or services by the venturers; (3) an agreement for joint proprietorship and control; and (4) an agreement to share profits. *Hyman Podell, supra* at 431; *Fishback* v. *United States, supra* at 625. In addition, some jurisdictions require the sharing of losses. This, however, does not appear to be the rule in New York. *Anderson* v. *National Producing Co.*, 253 F. 2d 834, 838 (C.A. 2, 1958).

The facts presented in the instant case fit the mold formed by the aforementioned elements. On June 29, 1962, S. & M. and Ten Oaks, as Harry's nominee, executed an agreement which specifically stated that the parties were thereby entering a joint venture for the performance of two construction contracts for the board of education. Pursuant to this agreement Harry contributed $50,000 and S. & M. contributed its services. The agreement endowed Harry with a measure of control and proprietorship by requiring that Harry's capital contribution be deposited in a special account for use essentially limited to the construction projects, and by requiring that all checks be signed by a designee of Ten Oaks as well as by an S. & M. representative.

---

[3] Secs. 761(a) and 7701(a)(2), I.R.C. 1954, define the term "partnership" as including joint ventures. Therefore, if we find that a joint venture existed the venturers will be taxed as partners. In the instant case Harry received payment prior to the completion of the construction projects and S. & M. offered this as explanation for its failure to file a partnership tax return. Although it is impossible to discern from S. & M.'s corporation income tax returns for 1962 and 1963, S. & M.'s attorney stated to the Court that amounts paid to Harry were treated as part of S. & M.'s cost of goods sold. In view of the respondent's tacit acquiescence in this treatment, we feel it is unnecessary to give further consideration to the matter. See Hyman Podell, 55 T.C. 429 (1970), in which we discuss the character of income in the hands of a joint venturer.

[4] As just indicated above, as the parties framed the issue herein it was generally conceded that if we were to hold a joint venture existed then Harry would have ordinary income and the corporation a deduction. If we were to hold that Harry owned preferred stock, he would be entitled to capital gain treatment; presumably under sec. 302, I.R.C. 1954.

We would note here that in our recent opinion in *Hyman Podell, supra* at 432, we held that lack of day-to-day managerial control does not necessarily militate against the existence of a joint venture when there is "control over * * * continued contributions of funds to the venture." See also *Fishback* v. *United States, supra* at 626, wherein it was stated that inequality in day-to-day control is not "fatal to the idea of a joint venture." The final traditional element indicating a joint venture is that the agreement of June 29, 1962, provided that S. & M. and Harry were to share equally in the profits of the two construction projects. The agreement guaranteed Harry a minimum profit of $40,000.

The agreement of June 29, 1962, as well as the manner in which S. & M. and Harry actually conducted their affairs with respect to the construction projects clearly indicate their relationship as joint venturers. However, for reasons not completely explained by the parties, the business venture was cast in the form of a preferred stock interest. The agreement of June 29, 1962, states that preferred stock was to be issued in order "To comply with the requirements of the Board of Education." Although the board of education would not accept the parties' original plan calling for a $50,000 subordinate loan by Harry to S. & M., the evidence presented at trial indicates that the board did not require issuance of preferred stock. All that was required was a capital contribution; its form was immaterial.

The certificate of incorporation of S. & M. was amended to authorize the issuance of 1,000 shares of $100 par value, nonvoting, preferred stock with an annual 10-percent cumulative dividend.[5] The preferred stockholders were to have priority over the common stockholders to the extent of $180 plus accumulated dividends. The amount of $180 represented to Harry his $50,000 contribution plus a guaranteed profit of $40,000. The stock was to be callable by S. & M. upon 30 days' notice, 2 years after issuance. Shortly prior to the actual issuance of the preferred stock, Harry and S. & M. agreed that the amount of dividends payable on the preferred stock to Harry was to be limited to 50 percent of the profit from the construction projects with any excess payable to S. & M. On August 27, 1962, 500 shares of preferred stock were issued to Ten Oaks. The certificate, however, was never delivered but was held by Greenberg in escrow.

We hardly need state that it is the substance of an agreement or transaction and not the form that governs questions of Federal taxation and in the instant case we find the issuance of preferred stock

---

[5] Testimony was adduced at trial to the effect that there was no business reason for making dividends payable on the preferred stock. Greenberg testified, "I don't know why we did it that way. I presume it had to have something in it about dividends." He also stated, "It would have looked funny to have a preferred stock without dividends."

to be mere form. The relationship between S. & M. and Harry was in substance a joint venture. Harry contributed capital not for the general purposes of S. & M. but to and in furtherance of a specific venture; i.e., the construction of two junior high schools. See *Hyman Podell, supra* at 432. In support of this we note that the agreement of June 29, 1962, provided a ceiling of 3 percent of the construction contracts upon the amount of joint venture capital which could be made available to S. & M. "for overhead and central office expense." This, together with the fact that the capital for the construction contracts was segregated from the general corporate capital of S. & M., indicates that Harry did not invest *in* S. & M. itself but, rather, invested in a joint venture *with* S. & M.

Although we are generally reluctant to recast the form of transactions intended by taxpayers, in this case we are faced with two conflicting manifestations of intent. The agreement of June 29, 1962, clearly states that a joint venture was contemplated and, yet, preferred stock was issued. In circumstances such as these we are compelled to choose the result which most closely approaches the substance of the situation. Cf. *Ragland Investment Co.*, 52 T.C. 867 (1969), affirmed per curiam 435 F. 2d 118 (C.A. 6, 1970).

In view of certain uncontested adjustments of the tax liabilities of all petitioners,

*Decisions will be entered under Rule 50.*