FEDERAL BULK CARRIERS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6115-73.    Filed May 18, 1976.

*William F. Indoe* and *Sydney Elliott Unger,* for the petitioner.
*Michael A. Menillo,* for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in petitioner's Federal corporate income tax as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1962 | $992.41 | 1966 | $31,030.19 |
| 1964 | 1,041.56 | 1967 | 15,016.00 |
| 1965 | 3,293.66 | 1968 | 53,288.65 |

The only matter in controversy is whether certain losses petitioner incurred in 1965 and 1966 were capital losses. If they were, then the deductions in respect thereof were subject to the limitation set forth in section 1211, I.R.C. 1954, and moreover, petitioner did not sustain a net operating loss in the year 1965 which could be carried back to the years 1962 through 1964 and carried forward to the years 1966 through 1968. See secs. 165(f), 172(c), and 1212. Furthermore, if petitioner is not entitled to a net operating loss deduction in 1966, it does not challenge the Commissioner's determination that, as a personal holding company, it is liable for the special tax on its undistributed personal holding company income as computed by the Commissioner. All of the facts have been stipulated.

Petitioner Federal Bulk Carriers, Inc., was incorporated under the laws of the State of New York on November 25, 1955. At the time the petition was filed, its principal office was located in New York, N.Y. Petitioner filed Federal corporate income tax returns for each of the calendar years 1962 through 1968 with the District Director of Internal Revenue, New York, N.Y.

In 1957 petitioner acquired 60 percent of the outstanding stock of Federal Tankers Ltd. (Tankers), a Canadian corporation, for

$18,837. By September 24, 1959, petitioner also acquired 60 percent of Tankers' subordinated notes for $1,299,070. The remaining 40-percent interest in the notes and stock of Tankers was acquired by Bessemer Securities Corp. (Bessemer), a domestic corporation.

Tankers was organized to build and charter a 41,246 deadweight ton tanker, eventually named the *Monarch.* Tankers, in turn, organized Federal Petroleum Carriers Ltd. (Carriers), a Canadian corporation, as its wholly owned subsidiary to contract for the building of the *Monarch.* The *Monarch* was built by Davie Shipbuilding Ltd. at its shipyard in Lauzon, PQ, Canada. Construction of the *Monarch* qualified under the Canadian Vessel Construction Assistance Act, and pursuant thereto, the owner of the ship was entitled to certain excess depreciation deductions for Canadian income tax purposes. The *Monarch* was launched on June 19, 1959, and delivered by the builder on September 24, 1959.

The *Monarch* was not to be used by either Carriers, Tankers, or petitioner for their own account. Instead, nearly a year prior to the ship's launching it was chartered to Imperial Oil Ltd. (Imperial), a Canadian corporation, by means of a somewhat complex chartering arrangement.

On July 15, 1958, the *Monarch* was bareboat-chartered by Carriers to Imperial for a term running until September 24, 1974. Imperial simultaneously bareboat-chartered the *Monarch* to Tankers for the same period. At the same time Tankers time-chartered the *Monarch* to Imperial until September 24, 1974.

The terms of the two bareboat charters were similar. Each set the charter hire at $1.10 per deadweight ton per month. The charterer obtained the right to "employ the vessel throughout the world in any lawful trade for which she is suitable * * * [except] in clean petroleum trade." The charterer agreed however, to "at its own expense, man, victual, navigate, operate, supply, and fuel the vessel and repair her as required * * * and pay all other charges and expenses of every kind and nature whatsoever incident to the possession, use, management, employment and operation of the vessel." The charterer was also required to maintain, periodically drydock, and insure the vessel.

The time charter between Tankers and Imperial provided for a charter hire of $2.70 per deadweight ton per month. However, this charter provided that the "Owner," Tankers, "lets" the

vessel equipped in a certain manner and "with full complement of Master, Officers and Crew * * * and due diligence to be exercised to maintain her in such state." Moreover, the "Owner" rather than the charterer "shall provide and pay for all provisions, deck and engine room stores, galley and cabin stores, and insurance on the Vessel; wages of the Master, Officers and Crew; consular fees pertaining to the Master, Officers and Crew; and also $100.00 per month for galley and crew fuel." The time charter further provided:

8. In the event of loss of time from deficiency of men or stores, breakdown of machinery, interference by Authorities, collision, stranding, fire or other accident or damage to the Vessel, not caused by the fault of the Charterer, preventing the working of the Vessel for more than twenty-four consecutive hours, or in the event of loss of time from breach of orders or neglect of duty by the Master, Officers or Crew, or from deviation for the purpose of landing any injured or ill person on board other than any who may be carried at Charterer's request, or from strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general, of the Master, Officers or Crew, or from interference with the use of the Vessel hereunder as mentioned in the third paragraph of Clause 55 hereof [relating to foreclosure or other proceedings in connection with the mortgage on the *Monarch*], payment of hire shall cease for all time lost until the Vessel is again in an efficient state to resume her service and has regained a point of progress equivalent to that when the hire ceased hereunder * * * but should the Vessel be delayed or driven into port or to anchorage by stress of weather or on account of accident to or other consideration for her cargo, such delay, departure, or loss of time shall be for Charterer's account. * * *

The time charter also specified that Imperial need not pay a portion of the hire due each month to the extent of $1.10 per deadweight ton if that amount was owed by Tankers to it under the second bareboat charter and paid by Imperial to Carriers under the first bareboat charter. Thus, liability for $1.10 of the total charter hire was governed by the bareboat charters whereas payment of the balance was subject to the different provisions of the time charter. As indicated hereinafter, payments under the charters were assigned as security for a large indebtedness that was incurred in order to pay for the *Monarch,* and the involved multistep chartering arrangement may have been required, in part, to obtain such financing.

The final cost of the ship was Can. $11,236,083. Of this amount $8 million (U.S.) was loaned to Carriers by institutional lenders. This loan (the Ship Mortgage Loan) was effectuated by the issuance of notes and bonds by Carriers pursuant to an

indenture of trust dated September 1, 1959, and various other agreements. The notes and bonds were secured by a mortgage on the *Monarch*. The amounts payable by Imperial to Tankers and Carriers under the aforementioned bareboat and time charters were assigned to the trustee. In addition, Carriers and Tankers were each required to maintain working capital in the amount of Can. $150,000, and petitioner and Bessemer guaranteed all of Carriers' obligations under the indenture of trust and related agreements.

At no time did Tankers or Carriers have any employees. From the time it was placed in service, the *Monarch* was managed by Mathiasen's Tanker Industries, Inc. As manager of the ship, it directed the vessel's actual day-to-day operations. Petitioner, however, maintained a daily desk log of the *Monarch's* operations.

Pursuant to a sales agreement (the 1961 sales agreement) dated July 31, 1961, petitioner and Bessemer sold their Tankers stock (30,000 shares) and notes (face value Can. $2,095,000) to Maple Leaf Mills Ltd. (Maple Leaf), a Canadian corporation for Can. $2,325,000. The parties thereto also agreed to a "scheme of reorganization" whereby Maple Leaf was to purchase the *Monarch* from Carriers (which upon the sale of the Tankers stock to Maple Leaf would become the latter's second-tier subsidiary) for Maple Leaf's non-interest-bearing promissory note in the amount of $11,286,082. Maple Leaf was to assume the obligations of Carriers under the indenture of trust and the vessel was to be chartered by Maple Leaf to Imperial under the first bareboat charter, by Imperial to Tankers under the second bareboat charter, and by Tankers to Imperial under the time charter. This arrangement permitted Maple Leaf to deduct depreciation on the vessel and interest under the debt obligations for purposes of the Canadian income tax. The sale by petitioner of its Tankers stock and notes to Maple Leaf constituted a sale of capital assets for Federal income tax purposes.

Simultaneously, with the sale of their interests in Tankers, petitioner and Bessemer formed Bessbulk Ltd. (Bessbulk), a Canadian corporation with an initial capital of Can. $1,943,000, consisting of a portion of the proceeds of the sale to Maple Leaf. Petitioner owned 60 percent of the shares and approximately 60 percent of the debentures of Bessbulk; the remaining shares and debentures were held by Bessemer. Pursuant to a commitment

agreement, dated July 31, 1961, petitioner and Bessemer agreed with Maple Leaf to cause Bessbulk to become party to an indemnity agreement (the 1961 indemnity agreement).

The 1961 indemnity agreement set forth estimates of revenue that would be derived from and expenses that would be incurred in operating the *Monarch* over the term (15 years) of the time charter to Imperial. Projected revenue ranged from Can. $1,257,525 for each of the first 5 years to Can. $1,202,850 for each of the final 5 years. Expenses (including off-hire insurance, for which separate figures were stated, but not including any allowance for depreciation in respect of the *Monarch*) were projected to increase from Can. $413,800 in each of the first 2 years to Can. $500,000 in each of the final 3 years. Bessbulk agreed to pay Maple Leaf its annual income to the extent available and necessary to indemnify Maple Leaf in the event the *Monarch's* actual earnings fell short of projected earnings (the difference between projected revenue and projected expenses). Maple Leaf agreed that at the expiration of the charter to Imperial, or upon the earlier sale of the *Monarch* (events which terminated the indemnity agreement) Bessbulk would receive 35 percent of the amount by which the *Monarch's* actual earnings exceeded projected earnings.

Under the 1961 indemnity agreement Bessbulk was prohibited from issuing additional shares of stock or amending the terms of its outstanding debentures. It could not engage in the active conduct of any business, but could only invest in the "preferred shares or bonds or debentures or other evidences of indebtedness in which the Canadian and British Insurance Companies Act, Part III, states that a company registered under it may invest its funds." The payment of dividends, repurchase of its shares, and retirement of its debentures were all restricted.

Pursuant to an agreement with Tankers dated July 31, 1961 (the same date which the sale, commitment, and indemnity agreements bore), Bessbulk agreed to "supervise" the manager of the *Monarch* for a monthly fee of $2,166, while it at the same time undertook to pay the manager's fee, which appeared to be somewhat less than the fee payable to Bessbulk. At no time, however, did Bessbulk have any employees. Leif Hoegh & Co., Inc., replaced Mathiasen's Tanker Industries, Inc., as manager under an agreement dated May 1, 1962. Bessbulk continued to

"supervise" the manager. Petitioner continued to maintain its desk log of the *Monarch's* daily activities.

As of June 20, 1963, petitioner and Bessemer agreed to sell their Bessbulk shares and debentures to Maple Leaf pursuant to a sales agreement (the 1963 sales agreement). The purchase price was to be determined at the earlier of the expiration of the charter of the *Monarch* to Imperial or the sale of the *Monarch* by Maple Leaf. The purchase price was to be based upon, among other things, the net worth of Bessbulk and the operating experience of the *Monarch*. The agreement incorporated the same revenue and expense projections set forth in the 1961 indemnity agreement. For any year in which the operations of the *Monarch* produced a loss, the amount of the loss plus the projected earnings for that year was defined as a "net revenue decrease." If operations produced earnings which, however, were less than projected earnings, the difference was also a "net revenue decrease." But actual earnings in excess of projected earnings produced a "net revenue increase" in the amount of the excess. The agreement provided for the periodic distribution to Maple Leaf of Bessbulk's net income to the extent necessary to compensate Maple Leaf for any "net revenue decreases" which had not been otherwise offset by "net revenue increases."

Upon termination of the time charter to Imperial or sale of the *Monarch* by Maple Leaf to someone unrelated to it, the agreement required computation of a "charter period deduction" defined as the amount, if any, by which aggregate "net revenue decreases" exceeded aggregate "net revenue increases" and distributions of Bessbulk income to Maple Leaf. The excess of the net worth of Bessbulk over the charter period deduction would constitute the "basic purchase price"[1] of the Bessbulk shares and debentures, 60 percent of which would be payable to petitioner. This purchase price was subject to adjustments, however, whereby Maple Leaf would be required to pay additional amounts out of profits earned in operating the *Monarch* after expiration of the Imperial charter or gain earned upon the sale of the vessel. In no event, however, could the total adjustment exceed the sum of the charter period deduction and amounts of Bessbulk income previously distributed to Maple Leaf.

---

[1] In the event that the net worth of Bessbulk should be less than the charter period deduction, the basic purchase price was fixed at $1.

Pursuant to other agreements also executed on June 20, 1963, petitioner replaced Bessbulk as "supervisor" of the *Monarch's* manager. By an agreement dated June 1, 1964, petitioner succeeded Leif Hoegh & Co., Inc., as manager of the *Monarch.* Its annual compensation for such services was set at $20,000. Petitioner continued to maintain its desk log of the daily operations of the *Monarch* until November 19, 1965. It was on that date that the *Monarch* was sold by Maple Leaf to Oswego Unity Corp., an unrelated third party.

Pursuant to an agreement dated November 18, 1965, petitioner, Bessemer, and Maple Leaf terminated the 1963 sales agreement. This latest agreement incorporated the same basic formula for determining the purchase price of the Bessbulk shares and debentures adopted in the 1963 sales agreement which in turn had been based upon the 1961 indemnity agreement.

During the period from July 31, 1961, through November 18, 1965, actual earnings from the *Monarch* consistently fell short of the earnings projected in the 1961 indemnity agreement. At the time the November 18, 1965, agreement was executed the amount by which the cumulative deficit in actual earnings exceeded Bessbulk's income for that period was estimated. Sixty percent of that amount—the portion which would reduce the price paid for petitioner's Bessbulk shares and debentures—was $501,684.52. Moreover, gain had been realized on the liquidation of a portion of Bessbulk's assets which had been held for more than 6 months. Sixty percent of this gain amounted to $100,907.59. On the basis of these computations and the provisions of the November 18, 1965, agreement Maple Leaf paid petitioner Can. $768,558 for its Bessbulk shares and debentures. This price was subject to adjustment after final audit of profit or loss from the *Monarch's* operations for the period ending November 19, 1965. A final audit determined that the difference between projected and actual earnings was greater than previously estimated. Sixty percent of the additional earnings deficiency totaled $48,011.81.

In 1966 additional gain was realized in connection with the contribution to and sale of a deposit required under the Canadian Vessel Construction Assistance Act to avoid recapture of excess depreciation claimed by Maple Leaf in respect of the *Monarch.* Petitioner was required under the November 18, 1965, agreement to contribute to this deposit, and its 60-percent share

of the resulting gain was $25,771.32. Accordingly, in 1966, petitioner paid Maple Leaf the net amount of $22,240.49.

On its Federal corporate income tax return for 1965 petitioner claimed a deduction in the amount of $400,776.93 ($501,684.52 minus $100,907.59) for "Loss by indemnification to Maple Leaf Mills Limited for guarantee of ship operation income pursuant to agreements." On that return petitioner reported gross income of $25,407.89 and claimed deductions totaling $411,171.16. As a result petitioner filed refund claims for each of the years 1962, 1963, and 1964, on which it claimed net operating loss carryback deductions. It received tentative allowances of $992.41, $2,276.15, and $3,988.16 for those years, respectively.

On its return for the year 1966 petitioner deducted $22,240.49 described as "Indemnification for guarantee of ship operation income pursuant to agreements." It also claimed a net operating loss deduction in the amount of $356,382.54. On its returns for the years 1967 and 1968, petitioner claimed net operating loss deductions of $337,491.25 and $292,666.24, respectively.

In his deficiency notice the Commissioner determined—

that "loss by indemnification" deductions claimed in the amounts of $400,776.93 and $22,240.49 for the taxable years ended December 31, 1965 and December 31, 1966, respectively, do not constitute ordinary loss deductions.

The Commissioner also disallowed the net operating loss deductions for the years 1962 through 1964, and 1966 through 1968 (which were based on carrybacks and carryforwards of the foregoing claimed "loss[es] by indemnification"), and determined that for the year 1966 petitioner was a personal holding company subject to the special tax on undistributed personal holding company income.[2]

The issue before us is whether losses sustained by petitioner in 1965 and 1966 were capital losses. We begin with the fact that these losses were incurred on the sale of petitioner's Bessbulk stock and debentures to Maple Leaf pursuant to the 1963 sales agreement and the agreement dated November 18, 1965. Ordinarily, such property would be a capital asset in the taxpayer's hands and any loss incurred on its sale would be a capital loss. Secs. 1221 and 1222 (2) and (4).

---

[2] No deficiency was determined for the year 1963 as the Commissioner also determined that for the year 1963 petitioner was entitled to carry back an investment credit from the year 1966.

Petitioner does not contend that the stock and debentures were not capital assets, but rather, takes the position that the form of the transaction which produced those losses should be disregarded. It asserts that the various Bessbulk-related transactions, when viewed as a whole, reveal the existence of a joint venture between itself, Bessemer, and Maple Leaf to share the profits and losses arising from the operation of the *Monarch.* In its view, Bessbulk was merely a device used to secure the performance by itself and Bessemer of their obligations as participants in the joint venture. Therefore, it argues, the losses here in issue were sustained by it as a participant in a joint venture and are deductible as business expenses, under section 162(a), or as losses for which it has not been compensated, under section 165(a).[3]

Respondent does not reply to these contentions by insisting that the losses in dispute be viewed merely as losses from the sale of the Bessbulk stock and debentures. On the contrary, he also seems to urge that their character be determined by the substance of the Bessbulk-related transactions viewed as a whole; however, his view of the substance of those transactions is far different from that of petitioner. Respondent contends that in connection with the sale of the Tankers stock and debentures to Maple Leaf, petitioner and Bessemer agreed to guaranty that the *Monarch*—the principal asset held by Tankers through its subsidiary Carriers—would produce specified levels of earnings. This guaranty was, in turn, secured by setting aside a portion (Can. $1,943,000 out of Can. $2,325,000) of the proceeds from the sale of the Tankers stock and debentures. Amounts eventually paid in satisfaction of the guaranty were in effect adjustments to the purchase price of the Tankers stock and debentures. Therefore, respondent asserts, relying on *Arrowsmith v. Commissioner,* 344 U.S. 6, and related cases, the character of the losses so incurred must be determined by reference to the

---

[3] Petitioner also contends that the losses were not properly reflected on its returns for 1965 and 1966. It contends that in 1965 it should have reported a capital gain in the amount of $100,907.59, arising from the liquidation of a portion of Bessbulk's assets, and a loss from the purported joint venture in the amount of $501,684.52, rather than a net loss of $400,776.93. As for 1966, petitioner claims that it realized a capital gain on the sale of the deposit required under the Canadian Vessel Construction Assistance Act in the amount of $25,771.32 and an ordinary loss arising from the joint venture in the amount of $48,011.81, rather than the net loss in the amount of $22,240.49 as shown on its return. Our disposition of the principal issue in this case makes it unnecessary for us to consider these contentions.

character of the gain on the original sale of Tankers stock and debentures. Accordingly, those losses must be deemed capital losses. We agree with respondent.

The relationship that existed between petitioner, Bessemer, Maple Leaf, and Bessbulk possessed few, if any, of the indicia of a joint venture. *Ray S. Robinson,* 44 T.C. 20, 34-35; *Hubert M. Luna,* 42 T.C. 1067, 1077-1078; *Beck Chemical Equipment Corp.,* 27 T.C. 840, 848-849. None of the several contracts upon which that relationship was bottomed purport to establish a joint venture as such. To be sure, this consideration may not be controlling, but it is a matter of some significance in the light of the fact that the contracts reflect a high degree of sophistication and careful draftsmanship and were obviously prepared by experienced lawyers. Moreover, although the common objective shared by participants in the supposed joint venture was the profitable operation of the *Monarch,* neither Bessemer nor petitioner contributed capital to that enterprise. As petitioner itself points out, the contributions to Bessbulk served primarily as security for the obligation to reimburse Maple Leaf for deficiencies in the *Monarch's* earnings. Nor is there any evidence that the *Monarch* was operated in a manner which represented to others that petitioner, Bessemer, and Maple Leaf were joint venturers. And to the extent that petitioner or Bessemer had control over the operations of the *Monarch* (outright or through Bessbulk), it appears to have been as a consequence of entirely separate contractual undertakings pursuant to which they were employed to manage the ship or to supervise the ship's manager. Above all, however, it is the absence of the central feature of a joint venture—a proprietary interest in the net profits of the enterprise coupled with an obligation to share its losses—which leads us to conclude that a joint venture did not exist.

To be sure, the terms of the 1961 indemnity agreement provided that if the aggregate profits of the *Monarch* over the term of the agreement exceeded a specified level petitioner and Bessemer would be entitled to 35 percent of the excess. However, the maximum revenue of the *Monarch* was limited by the terms of the charters to Imperial. Thus, for actual earnings to exceed projected earnings the expenses of operating the *Monarch* would have to prove less than projected, a prospect hardly shown to have been likely, or realistically anticipated, on this record. But whether that prospect was real or illusory, it was in any event

eliminated by the 1963 sales agreement, which restructured the entire arrangement. According to provisions in that agreement the price Maple Leaf was required eventually to pay for the Bessbulk stock and debentures could not exceed the net worth of Bessbulk's assets plus the amount of the earnings thereon previously distributed to Maple Leaf. Thus, any amounts received by petitioner in excess of its contributions to Bessbulk would be limited to the appreciation in value of the preferred shares, bonds, and the like in which those funds were required to be invested and the earnings thereon. On the other hand, the amount of such contributions which petitioner would eventually recoup was at all times subject to being reduced by its share of the amounts needed to compensate Maple Leaf dollar-for-dollar for the aggregate amount by which the *Monarch's* earnings over the duration of the agreed period fell short of projected earnings. Such an arrangement is hardly indicative of a joint venture. Compare *S. & M. Plumbing Co.,* 55 T.C. 702.

The precise objectives which petitioner, Bessemer, and Maple Leaf sought to attain through this maze of agreements are not clearly disclosed in the record. Indeed, this is but one of several respects in which the record, although replete with lengthy, highly complex documents, is disturbingly vague. Compelled as we are to distill the substance of these transactions from bare contracts, we find respondent's characterization thereof as an agreement to adjust the purchase price of the Tankers stock and debentures more persuasive than that put forward by petitioner.

Petitioner and Bessemer sold all of their Tankers stock and debentures to Maple Leaf for Can. $2,325,000. Contemporaneously, and it may reasonably be inferred as a condition of that sale, they agreed to guaranty that over a given period the *Monarch*—the principal asset held by Tankers and its wholly owned subsidiary, Carriers—would produce specified earnings for Maple Leaf. It was in the ultimate settlement of this obligation that the losses whose character is here in dispute were incurred. These losses were thus so intimately tied to the Tankers sale that their character must be ascertained by reference to the original transaction—the sale of the Tankers stock and debentures. *Arrowsmith v. Commissioner,* 344 U.S. 6; *Duveen Brothers, Inc.,* 17 T.C. 124, affirmed per curiam 197 F.2d 118 (2d Cir.); certiorari denied 344 U.S. 884; *Kimbell v. United States,* 490 F.2d 203 (5th Cir.); *Estate of James M. Shannonhouse,* 21 T.C.

422; *Rees Blow Pipe Manufacturing Co.,* 41 T.C. 598, affirmed per curiam 342 F.2d 990 (9th Cir.); *John E. Turco,* 52 T.C. 631. This conclusion is buttressed by the fact that the petitioner and Bessemer were required to set aside the bulk of the proceeds they received from that sale, and it was out of these funds that their obligations under the guaranty were to be satisfied. Accordingly, since the sale of the Tankers stock and debentures was a sale of capital assets, the losses incurred by petitioner in 1965 and 1966 were capital losses.[4]

*Decision will be entered for the respondent.*

---

[4] As additional support for its position petitioner relies on the decision of the Federal Court of Canada in *Maple Leaf Mills Ltd. v. Minister of National Revenue,* 72 Dom. Tax Cas. 6166, in which it was determined that Maple Leaf received income for Canadian income tax purposes upon the purchase of the Bessbulk stock and debentures for less than their fair market value. We have reviewed that decision and find nothing therein which persuades us to reach a different result here. Aside from the obvious fact that that decision involved Canadian income tax principles, which may differ from U.S. principles in important respects, it should be noted that Maple Leaf's position in the various Bessbulk-related transactions was far different from that of petitioner. Although a transaction involving a payment by one taxpayer and corresponding receipt by another may often—and indeed, ordinarily—have complementary tax consequences to both, this need not always be so. For it is quite possible that the same transaction may be subject to quite different analyses depending upon whether it is viewed from the point of view of the payor or that of the recipient. (For example, fees received for rendering services constitute ordinary income in the hands of the recipient, whereas the payment of those fees might be nondeductible either because it represents a personal expenditure, *United States v. Gilmore,* 372 U.S. 39, or a capital outlay, *Woodward v. Commissioner,* 397 U.S. 572. Similarly, a payment by one person may be business related from his point of view and therefore deductible by him, while it might at the same time represent a receipt that does not constitute taxable income to the payee. Compare *Bank of Palm Beach & Trust Co. v. Commissioner,* 476 F.2d 1343 (Ct. Cl.), with *Estate of Carter v. Commissioner,* 453 F.2d 61 (2d Cir.).) In this case, payment by petitioner merely served as a reduction of the purchase price that it received for the Tankers stock and debentures, while from Maple Leaf's point of view it could readily be treated by the Canadian court as the receipt of income either from a bargain purchase of securities or from the operation of the *Monarch.*