FREEDOM NEWSPAPERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Freedom Newspapers, Inc. v. Commissioner
Docket No. 915-75.
United States Tax Court
T.C. Memo 1977-429; 1977 Tax Ct. Memo LEXIS 12; 36 T.C.M. (CCH) 1755; T.C.M. (RIA) 770429; December 22, 1977, Filed *12 In 1969 petitioner acquired four newspapers. In order to induce it to purchase one of these newspapers, petitioner ultimately received $100,000 from a third party. Held, the $100,000 received by petitioner constitutes a reduction of its basis in one of the newspapers. Brown v. Commissioner,10 B.T.A. 1036 (1928), and Federal Bulk Carriers, Inc. v. Commissioner,66 T.C. 283 (1976), affd. on other grounds, 558 F.2d 128 (2d Cir. 1977), followed. Austin H. Peck, Jr.,John F. Walker, Jr.,William R. Nicholas,Thomas G. Bost,McGee Grigsby, and Lon M. Mickelson, for the petitioner. Frederick B. Strothman, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a *13 deficiency of $48,000 in petitioner's Federal income tax for 1971. The sole issue for resolution is whether $100,000 received by petitioner in 1971 constitutes ordinary income or a reduction of petitioner's basis in certain property. FINDINGS OF FACT Some facts were stipulated and are so found. Petitioner is a California corporation which maintained its principal office at Santa Ana, California, when the petition herein was filed. At all times material herein, petitioner was a calendar year, accrual basis taxpayer and filed its 1971 corporate income tax return with the Internal Revenue Service Center at Ogden, Utah. Petitioner is engaged (either directly or through controlled organizations) in the ownership, publication, and distribution of newspapers in various states. In 1968 it learned that Perry Publications, Inc. (Perry), the owner of a large number of newspapers located in the southeastern United States, had decided to dispose of twenty-six newspaper properties, and had authorized a newspaper broker, William L. Matthew, to negotiate for the sales. Matthew had associated another broker, O. L. Taylor, to assist in the negotiations. To facilitate the sale of its *14 properties, Perry divided the total package into several smaller groups of newspapers. It also made each sale of the smaller groups, and any brokerage commissions which might be earned by Matthew and Taylor, [1] contingent on the sale of all twenty-six newspapers. During 1968, Matthew and Taylor approached petitioner to ascertain whether it was interested in purchasing a group of newspapers located in Florida. The group included: The Playground Daily News, the Panama City News, the Fort Pierce News-Tribune, and the Jackson County Floridan (Floridan). Perry offered the Playground Daily News, the Panama City News, and the Jackson County Floridan as a package; the Fort Pierce News-Tribune was available for purchase either as part of the package or separately. The total purchase price placed upon the four Florida newspapers by Perry was $10,015,315, of which $708,331.56 was allocated to the Jackson County Floridan. The latter figure was a product of discussions between Perry, Matthew, and Taylor. [2]
*15 Representatives of petitioner, principally C. H. Hoiles, now petitioner's chairman of the board and chief executive officer, and V. L. DeBolt, now deceased, formerly an officer of petitioner, discussed the four Florida newspapers, their operations, and the offer with Matthew and Taylor. The negotiations covered a period of several months. After their discussions petitioner's representatives determined that petitioner's interests could best be served by purchasing only three of the newspapers, the Playground Daily News, the Panama City News, and the Fort Pierce News-Tribune, but not the Jackson County Floridan. Petitioner's reasons for not wanting to purchase the Jackson County Floridan included the following: Unlike substantially all of petitioner's newspapers, the Jackson County Floridan was a "job shop" operation; that is, it had neither printing presses of its own nor operating personnel, and its newspaper was actually printed at the plant of the Panama City News-Herald. Moreover, in petitioner's view, the Floridan's operation and potential market were too small to justify the assignment of petitioner's personnel to it or to spend time on market development; the population *16 which it served was declining; and petitioner did not consider the Floridan to be worth $708,331.56. Throughout the negotiations, Perry continued to insist, through Matthew and Taylor, that in order for petitioner to purchase the Panama City News and the Playground Daily News, it must purchase the Jackson County Floridan; however, petitioner continued to oppose the purchase of the latter. Because their anticipated commissions depended upon the sale of the Florida package, and therefore upon the sale of the Floridan, Matthew and Taylor decided to induce petitioner to purchase the Floridan. After intensive negotiations in January 1969, Taylor entered into an agreement with petitioner respecting the Floridan. Said agreement provided that if petitioner should acquire the Floridan, Taylor would undertake to resell it on petitioner's behalf for at least $708,331.56 (petitioner's cost) within one year of closing. If such a sale was not effected, Taylor agreed to pay petitioner $100,000, which amount would be escrowed during the one-year period. This agreement was formalized on April 22, 1969. On April 23, 1969, Perry and petitioner entered into an agreement under which Perry agreed *17 to sell and petitioner agreed to buy the assets of the Playground Daily News, the Fort Pierce News-Tribune, and all of the issued and outstanding stock of Bay County Publishers, Inc., which owned the Panama City News and the Jackson County Floridan. This sale was closed on July 3, 1969. On that date the assets of the Playground Daily News and the Fort Pierce News-Tribune and the stock of Bay County Publishers, Inc., were transferred from Perry to petitioner. Shortly after the closing, the board of directors of Bay County Publishers, Inc., adopted a plan of complete liquidation under section 332 [3] of the Internal Revenue Code of 1954, and pursuant to the plan the assets of the Jackson County Floridan and the Panama City News-Herald were transferred to petitioner, which then contributed these four newspaper properties to the capital of petitioner's wholly owned subsidiary, Florida Freedom Newspapers, Inc. (Florida Freedom). Pursuant to the April 22, 1969, agreement, an escrow was opened at the Bank of America in Santa Ana, California, and on August 26, 1969, cash and *18 receivables with a value of approximately $100,000 were deposited in escrow by Taylor. Matthew and Taylor were unable to sell the Floridan within one year for the agreed price; consequently, the parties agreed to extend the escrow period for an additional year until July 3, 1971. Matthew and Taylor again were unable to sell the Floridan by July 3, 1971, and the escrowed funds became due and payable to petitioner on that date. Petitioner was in receipt of the $100,000 by December 31, 1971. In January 1972 Florida Freedom was finally able to sell the Jackson County Floridan at a substantial loss. [4] The $100,000 amount paid from escrow to petitioner was reflected on the 1972 Federal income tax return of Florida Freedom as a reduction of the basis of the Jackson County Floridan in the hands of Florida Freedom. The effect of this was that Florida Freedom's reported loss on the sale of the Jackson County Floridan was $100,000 smaller than if the escrow had not been created and the amount not paid to petitioner. Respondent proposed the assessment *19 of a deficiency in petitioner's 1971 Federal income tax based on his contention that the $100,000 received by petitioner was ordinary income.
OPINION In 1969, pursuant to an agreement between petitioner and Perry, petitioner acquired four newspapers. In order to induce it to purchase one of these newspapers, the Jackson County Floridan, petitioner ultimately received $100,000 from a third party. The sole issue for decision is the proper tax treatment to be accorded the receipt of this amount by petitioner. In support of its position that the $100,000 constitutes a reduction of its basis in the Floridan, petitioner makes two arguments. First, petitioner maintains that the facts of this case fall within the rule that an asset's basis in the hands of a purchaser must be reduced by the value of any payments received by the purchaser under a third party agreement intended to induce the purchase. See Brown v. Commissioner,10 B.T.A. 1036 (1928). Petitioner's second argument is more conceptual in nature. Specifically, in reliance upon the doctrine established by the Supreme Court in Arrowsmith v. Commissioner,344 U.S. 6 (1952), and as further applied *20 in subsequent cases, petitioner contends that because the $100,000 was received as a direct consequence of its purchase of the Floridan, the payment's character must be determined by reference to that transaction. Thus, petitioner maintains, the payment represents a reduction in the price paid by it for the Floridan. Respondent, on the other hand, views the transaction in a somewhat different light. He believes that the $100,000 represents nothing more than liquidated damages for Taylor's failure to sell the Jackson County Floridan at the agreed price within the agreed time period. In other words, under respondent's approach, the agreement between Taylor and petitioner should be viewed as separate and apart from petitioner's purchase of the newspaper. Accordingly, respondent, relying on Smith v. Commissioner,50 T.C. 273 (1968), affd. 418 F.2d 573 (9th Cir. 1969), maintains that the $100,000 is all taxable to petitioner as ordinary income. After careful consideration of all of the evidence, we believe that the agreement between petitioner and Taylor cannot be separated from petitioner's purchase of the Floridan. Accordingly, we agree with petitioner. *21 [5]
In Brown v. Commissioner,supra, Bache, the majority shareholder of a corporation, wanted a particular minority interest in the corporation, which was for sale, to be purchased by someone friendly to the corporation. Bache urged Brown to purchase the stock, but Brown thought its price was excessive. To induce the purchase, Bache agreed to pay Brown an amount equal to 15 percent of back salary owed Bache by the corporation "when received." Bache eventually paid the 15 percent to Brown and the Government asserted that the payment *22 was ordinary income to Brown. The Board of Tax Appeals rejected the Commissioner's position, holding that the payment constituted a reduction in petitioner's cost basis in his stock. The Board stated: Petitioner acquired the stock from the Jackson estate coupled with a contract that Bache would, in effect, make the cost to petitioner less than the agreed consideration between petitioner and the Jackson estate. When the two contracts are considered together upon the basis of the intent of the parties when made, and in the light of the results reached in their final consummation, we fail to see how the amount in question can be considered as taxable income. [10 B.T.A. at 1054, 1055]
We believe the same rationale applies in 3he instant case. Petitioner was reluctant to purchase the Jackson County Floridan for several reasons, one of which was that it believed the price excessive. [6] With an interest in completing the sale, Taylor, just one day prior to petitioner's agreement with Perry, finalized an agreement with petitioner under which he promised either to sell the newspaper or pay petitioner $100,000. In view of the circumstances, it is obvious that the agreement *23 with Taylor was intended to and succeeded in inducing petitioner's purchase of the Jackson County Floridan. For this reason, in making the determination as to whether the $100,000 received by petitioner constitutes taxable income, we must consider the end effect of both contracts. In other words, even though petitioner contracted with two different parties, the two agreements were, nevertheless, each a part of the same transaction and must be so viewed. Petitioner, under its contract with Perry, purchased the newspaper for about $708,000. This was done with the understanding, embodied in the agreement with Taylor, that Taylor would sell the newspaper, or upon his failure to do so, pay petitioner $100,000. Had Taylor sold the newspaper, petitioner would have recovered its investment.However, if Taylor's efforts proved fruitless, the net cost of the Floridan to petitioner would be approximately $608,000. The latter is what occurred. Accordingly, *24 in our consideration of both contracts, we find the $100,000 does not constitute taxable income to petitioner, but was merely a reduction of the cost of the newspaper. [7]
Respondent contends that in reality petitioner bargained for the services of Taylor, and that the $100,000 was merely liquidated damages in the event Taylor failed to sell the newspaper. Because the $100,000 represents an amount received as liquidated damages, respondent, under the authority of four cases, argues that the $100,000 constitutes ordinary income. See Handelman v. Commissioner,509 F.2d 1067 (2d Cir. 1975); Smith v. Commissioner,supra; Boatman v. Commissioner, 32 T.C. 1188 (1959); Johnson v. Commissioner,32 B.T.A. 156 (1935). In each of these cases the fact pattern is generally as follows: the taxpayer entered *25 into an agreement to sell a capital asset to a prospective purchaser.The prospective purchaser made a partial payment which was forfeitable to the taxpayer in the event the prospective purchaser failed to purchase the asset. When the purchase was not consummated, the amount paid was forfeited and the taxpayer reported this amount as capital gain on the theory that it replaced the proceeds the taxpayer would have received if he had successfully sold the asset. In each case the Court rejected the taxpayer's position on the basis that a sale or exchange of a capital asset had not occurred. We might agree with respondent's contention if the agreement with Taylor was separate and distinct from petitioner's purchase of the Jackson County Floridan; [8] however, as we have held above, that approach is not proper. Moreover, the cases cited by respondent are *26 distinguishable from the instant one because, unlike the present situation, in each of those cases no sale had occurred. See Lowe v. Commissioner,44 T.C. 363, 373 (1965). In the alternative, we believe petitioner's position is supportable under the doctrine established by the Supreme Court in Arrowsmith v. Commissioner,344 U.S. 6 (1952), as subsequently applied by this Court in Federal Bulk Carriers,Inc. v. Commissioner,66 T.C. 283 (1976), affd. on other grounds 558 F.2d 128 (2d Cir. 1977). [9]
In Federal Bulk Carriers, Inc., the purchase price for certain securities was to be adjusted subsequent to their sale by reference to the profitability of the underlying business sold. A portion of the purchase price was escrowed to secure these profit warranties. When the post-sale operation failed to produce the anticipated profits, the seller of the stock (the petitioner) became obligated *27 to pay certain amounts to the purchaser under the secured warranty agreement. The petitioner attempted to deduct the amount so paid as an ordinary expense. In reliance on Arrowsmith, we agreed with respondent and found that the amounts paid in satisfaction of the guaranty were in effect adjustments to the purchase price of the stock. In so doing we said: Petitioner and Bessemer sold all of their Tankers stock and debentures to Maple Leaf for Can. $2,325,000. Contemporaneously, and it may reasonably be inferred as a condition of that sale, they agreed to guaranty that over a given period the Monarch--the principal asset held by Tankers and its wholly owned subsidiary, Carriers--would produce specified earnings for Maple Leaf. It was in the ultimate settlement of this obligation that the losses whose character is here in dispute were incurred. These losses were thus so intimately tied to the Tankers sale that their character must be ascertained by reference to the original transaction--the sale of the Tankers stock and debentures. Arrowsmith v. Commissioner,344 U.S. 6; * * * [Emphasis added.] [66 T.C. at 294]. In the present case, *28 a warranty was negotiated, secured, and essentially made a condition of petitioner's purchase of the Floridan. Indeed, petitioner continually opposed the purchase of the Floridan until the warranty agreement with Taylor was consummated. Under these facts, the payment received by petitioner pursuant to the agreement, even though made several years after the purchase of the Floridan, was sufficiently tied to the purchase that its characterization must be made by reference to the original transaction. Thus, we find the $100,000 receipt must be characterized as a reduction in the purchase price of the Floridan, and accordingly represents a reduction in petitioner's basis in the Floridan. [10]
Decision will be entered for the petitioner. Footnotes
1. Matthew and Taylor anticipated that they would realize combined commissions and capital gains in excess of $1 million, if all of the Perry properties were sold.↩
2. The process of evaluating the Jackson County Floridan took into account the industry-wide standard practice of valuing such properties at two and a half to three times gross income.↩
3. All statutory references are to the Internal Revenue Code of 1954, as in effect for the year in issue.↩
4. Florida Freedom sold the Floridan on January 18, 1972, for $300,000 -- approximately $400,000 less than petitioner's cost.↩
5. The parties apparently do not attach any significance to the fact that petitioner received the $100,000 payment while its subsidiary, Florida Freedom, reduced its basis in the Jackson County Floridan. At the time of its acquisition of the newspaper, Florida Freedom's basis was the same as petitioner's. Secs. 351, 362. Although the issue is not argued by the parties, presumably any items which would have had an effect on petitioner's basis in the newspaper, had it continued to hold it, would also affect Florida Freedom's basis under an open transaction theory. See Burnet v. Logan,283 U.S. 404↩ (1931).
6. Indeed, petitioner's belief that the price of the Floridan was excessive was evidenced by the fact that petitioner's subsidiary sold the Floridan after two and one-half years for about $400,000 less than what petitioner had paid for it.↩
7. Respondent in his brief attempts to factually distinguish Brown v. Commissioner,10 B.T.A. 1036 (1928), from the instant case.Because we believe the Board's decision in Brown↩ was merely illustrative of a broader principle, we find respondent's attempted distinctions to be without substance.
8. For example, assume petitioner had purchased the Jackson County Floridan without any prior resell agreement with Taylor, and subsequently, Taylor agreed to sell the newspaper for petitioner or forfeit $100,000. Taylor's forfeiture, in that instance, would, under the cases cited by respondent, constitute ordinary income.↩
9. Indeed, the Board's decision in Brown v. Commissioner,supra, may very well have been subsumed by the Supreme Court's decision in Arrowsmith v. Commissioner, 344 U.S. 6↩ (1952).
10. The fact that the character of a payment rather than of a receipt was at issue in Federal Bulk Carriers, Inc. v. Commissioner,66 T.C. 283 (1976), does not distinguish that case from the present one. See Lowe v. Commissioner,44 T.C. 363↩ (1965).