**FEDERAL BULK CARRIERS, INC.,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 806, Docket 76–4162.**

United States Court of Appeals, Second Circuit.

Argued April 20, 1977.

Decided July 19, 1977.

William F. Indoe, New York City (Sullivan & Cromwell, Robert J. McDonald, New

York City, of counsel), for plaintiff-appellant.

Daniel F. Ross, Washington, D. C. (Myron C. Baum, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, Gilbert E. Andrews, Gary R. Allen, Washington, D. C., of counsel), for respondent-appellee.

Before SMITH and FEINBERG, Circuit Judges, and BRIEANT, District Judge.*

BRIEANT, District Judge.

This case was tried in the Tax Court upon stipulated facts, set forth fully in the opinion of Judge Raum below, reported at 66 T.C. 283 (1976). Familiarity therewith is assumed. Briefly stated, appellant (hereinafter "Taxpayer") and another owned all the stock and debentures of a corporation, "Tankers," the sole asset of which was a mortgaged vessel, the *S.T. Federal Monarch.* The *Monarch* had been built for Tankers, and on its completion in September 1959, was delivered under bareboat charter to a large Canadian oil company for the duration of the mortgage.

On July 31, 1961, after a history of unprofitable operation, Taxpayer and the other owner sold all their interest in Tankers to an unrelated party, "Maple Leaf." That sale of Tankers' stock and notes constituted a sale of capital assets for federal income tax purposes. It was so reported, and taxed at the favorable rates applicable to long-term capital gains. *See* § 1201 Internal Revenue Code of 1954, as amended, 26 U.S.C. § 1201.

Simultaneously with the sale of their interest in Tankers to Maple Leaf, Taxpayer and the other selling shareholder formed a Canadian corporation, "Bessbulk," in which they placed a portion of the sales proceeds, as consideration for stock and debentures issued to them by Bessbulk. Taxpayer and Bessbulk then agreed, to the extent of Bessbulk's annual income, with limitations not relevant here, to indemnify Maple Leaf if the future earnings of the Monarch (during the balance of the charter) did not reach amounts projected in the agreement for the sale of Tankers stock and notes. The same agreement provided that upon the expiration of the charter, or the earlier sale of the *Monarch,* Bessbulk would receive 35% of the amount, if any, by which *Monarch's* actual earnings exceeded the projected earnings.

As of June 20, 1963, Taxpayer and the other owner agreed to sell their Bessbulk shares and debentures to Maple Leaf pursuant to a new written agreement (the "1963 Sales Agreement"). The purchase price to be paid by Maple Leaf for all of the shares and debentures of Bessbulk was to be determined by a formula, at the earlier of the expiration of the charter of the *Monarch,* or the sale of the *Monarch* by Maple Leaf. The formula took into consideration the net worth of Bessbulk's securities portfolio, in which all its original capital was invested, and the operating experience of the *Monarch,* all as set forth in detail in the Agreement, and explained in the opinion below.

In November 19, 1965, the *Monarch* was sold by Maple Leaf to an unrelated third party. By agreements executed respectively on November 18 and 19, 1965, and having that sale in contemplation, Taxpayer, the other seller and Maple Leaf terminated the 1963 Sales Agreement with Maple Leaf, and provided instead for a sale by the owners of their Bessbulk shares and debentures to Maple Leaf, pursuant to the same basic formula for determining the purchase price found in the 1963 Sales Agreement, which in turn had been based upon the 1961 sales agreement.

As a result of these events and related matters, Taxpayer claimed on its corporate income tax return for 1965, a deduction in the amount of $400,776.93 for "[l]oss by indemnification to Maple Leaf . . . for guarantee (sic) of ship operation income pursuant to agreements." At issue was whether this loss was an ordinary loss deduction for Taxpayer, pursuant to § 165 of the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 165. The Commissioner asserted that this loss and a related loss arising in 1966 out of the same events

---

* Of the Southern District of New York, sitting by designation.

were long-term capital losses, deductible under § 1211.

The Tax Court determined that the Commissioner's position was correct, observing: "We begin with the fact that these losses were incurred on the sale of petitioner's Bessbulk stock and debentures to Maple Leaf, pursuant to the 1963 Sales Agreement and the agreement dated November 18, 1965. Ordinarily, such property would be a capital asset in the taxpayer's hands and any loss incurred on its sale would be a capital loss. Sections 1221, 1222(2) and (4) [of the Internal Revenue Code of 1954, as amended]."

In this the court below was undoubtedly correct. The 1963 Sales Agreement and the November 18, 1965 agreement clearly show on their face that these knowledgeable parties cast their transaction voluntarily into a certain formal structure, namely, the sale of stock and debentures held more than six months. Having done so, they should be and are, bound by the tax consequences of the particular type of transaction which they created. *Cf. Higgins v. Smith*, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940); *Gray v. Powell*, 314 U.S. 402, 414, 62 S.Ct. 326, 334, 86 L.Ed. 301 (1941) ("choice of disregarding deliberately chosen arrangements for conducting business affairs does not lie with the creator of the plan.")

■ The form of the transaction adopted by Taxpayer is in accordance with the economic reality of the transaction, a long-term capital loss incurred as a result of the sale of stock and debentures. Although the Commissioner can restructure the form of a particular transaction in order to treat the economic substance of what took place according to what it is, rather than what it is claimed to be, such procedure is appropriate only where it is necessary to protect the fisc and prevent· tax avoidance. *Cf. Commissioner of Internal Revenue v. Court Holding Company*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945).

Taxpayer contended in the Tax Court and here that the form of the transaction which produced the losses should be disregarded. Taxpayer contended that a joint venture, or a transaction entered into for profit, had taken place which would permit full deduction as an ordinary loss under § 165(a) of the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 165(a).

The Commissioner and the court below apparently acquiesced in restructuring of the sale of stock and debentures pursuant to written agreements so as to treat it as a part of the entire chain of transactions beginning with the sale of the Tankers stock in 1961, and the simultaneous guaranty that the *Monarch* would produce specific levels of earnings, which guaranty was secured by making the investment in Bessbulk. The Commissioner and the court below concluded that the amounts eventually paid in satisfaction of the guaranty were in effect adjustments to the original purchase price of the Tankers stock and debentures. Applying the doctrine of *Arrowsmith v. Commissioner of Internal Revenue*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952), the Court concluded that "the character of the losses so incurred must be determined by reference to the character of the gain on the original sale of Tankers stock and debentures." Accordingly, the losses were held to be capital losses.

Since the 1963 and 1965 transactions were structured as sales of capital assets, we need not reach or consider the applicability here of *Arrowsmith*.[1]

■ Whether or not a sale or exchange of a capital asset occurred involves "the legal characterization, for federal income tax purposes, of the transactions between the parties," which is "not a question of

---

1. *Arrowsmith* and its progeny, involve adjustments between transferors and transferees, occurring subsequent to an initial closed transaction. Factually analogous is *Duveen Brothers, Inc. v. Commissioner of Internal Revenue*, 17 T.C. 124 (1951), *aff'd.* 197 F.2d 118 (2d Cir.), *cert. denied*, 344 U.S. 884, 73 S.Ct. 182, 97 L.Ed. 684 (1952). Furthermore, *Arrowsmith* has been applied in cases such as this "where the parties have agreed to share in an up side profit potential . . . ." (Appellant's Reply Brief, p. 6). *See Lowe v. Commissioner of Internal Revenue*, 44 T.C. 363 (1965) [acq. as to result only, 1966–1 Cum.Bull. p. 2].

fact, but rather one of law," fully reviewable by us on appeal. *Union Planters National Bank of Memphis v. United States*, 426 F.2d 115, 117 (6th Cir.), *cert. denied* 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970), cited with approval in *Handelman v. Commissioner of Internal Revenue*, 509 F.2d 1067, 1070 (2d Cir. 1975).

■ Because by its own *bona fide* documents Taxpayer agreed to sell capital assets held more than six months and did so, the result reached in the Tax Court was undeniably correct.

That the federal court of Canada in adjudicating Canadian tax liabilities of Maple Leaf treated its receipts from the same transaction as ordinary income [*Maple Leaf Mills Ltd. v. Minister of National Revenue*,

72 Dom.Tax Cas. 6166 (1972)] is not binding on this Court or the Tax Court, and entitled to no weight under the circumstances here present.

The Judgment appealed from is affirmed.

FEINBERG, Circuit Judge, concurring:

I would affirm the judgment of the Tax Court on Judge Raum's opinion, filed May 18, 1976. Accordingly, I concur in the result here.