FRED H. LENWAY & COMPANY, INC., PETITIONER v. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 6370–74.     Filed January 30, 1978.

*Max Weingarten,* for the petitioner.
*James H. Ross, Jr.,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for its fiscal year ended January 31, 1968, in the amount of $115,705. This deficiency occurred as a result of the disallowance of an ordinary loss deduction claimed by petitioner for its fiscal year ended January 31, 1971, and carried back to its fiscal year ended January 31, 1968.

The issue to be determined is the deductible character of certain losses sustained by petitioner during its fiscal year 1971.

## FINDINGS OF FACT

Some facts have been stipulated and are so found.

Petitioner Fred H. Lenway & Co., Inc., is a California corporation with its principal place of business in San Francisco, Calif., at the time the petition herein was filed. At all times material herein, petitioner was engaged in a metal trading business covering both import and export. Southern California Chemical Co. (hereinafter referred to as SCC) is a California corporation engaged in the production of metallic chemicals. Since 1964, petitioner and SCC owned and operated as a joint venture a chemical and metallurgical plant in Ironton, Ohio (hereinafter referred to as the joint venture), specializing in reclaiming metals, especially molybdenum and tungsten, from residues and petroleum by-products.

The joint venture also owned a large amount of bulk bismuth

catalyst and a bismuth smelter. The smelter was located at SCC's place of business and was acquired for the purpose of extracting bismuth.

Since November 1966, the joint venture had a contract with General Electric Co. to convert tungsten residues into synthetic scheelite for delivery to the General Electric plant in Cleveland, Ohio. This business grew in volume and in 1968 the joint venture obtained a contract from General Electric to extract tungsten from approximately 10,000 tons of low-grade residues.

Due to the limited production capacity of the Ironton, Ohio, facility, the joint venture could only process approximately 1,000 tons of residues a year for General Electric. The joint venture therefore began to look for additional facilities to acquire for expansion purposes.

On September 1, 1968, petitioner acquired property on which was situated the only tin smelter in the United States. The property (hereinafter the Texas property) was located in Texas and included approximately 120 acres of land.

On February 17, 1969, petitioner and SCC organized the Gulf Chemical & Metallurgical Corp. (Gulf) under the laws of the State of Texas. The articles of incorporation provided for authorized capital of 1 million shares of $10 par value stock.

On March 21, 1969, pursuant to section 351,[1] petitioner and SCC transferred inventory consisting of bismuth-bearing catalysts and bismuth metal to Gulf in exchange for common stock as follows:

|  | *Petitioner* | *SCC* | *Total* |
|---|---|---|---|
| Net equity | $236,095 | $193,169 | $429,264 |
| Shares issued | 22,000 | 18,000 | 40,000 |
| Percent ownership | 55% | 45% | 100% |

After Gulf's incorporation, the joint venture transferred its bismuth smelting operation to Gulf and caused Gulf to take over the General Electric contract. All remaining operations of the joint venture continued to be carried out at its plant in Ironton, Ohio.

Gulf conducted its operations on the Texas property, which it leased from petitioner at a rental of $10,000 per month. The

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable period of issue.

lease granted Gulf an option to purchase such property for $1 million cash. Both petitioner and SCC anticipated that Gulf's operations would produce substantial profits during its first year of production.[2]

Some time prior to September 10, 1969, Associated Metals & Minerals Corp. (Associated) began investigating the possible acquisition of petitioner. Associated is one of the largest privately owned companies engaged in the business of international trading in ore and metals. It also operates miscellaneous manufacturing facilities in the United States and overseas. In the process of its investigation of petitioner, Associated became interested in participating in Gulf. As a result, a series of meetings among representatives of petitioner, Gulf, SCC, and Associated were held. The main purpose of the meetings, the first of which was held on September 10, 1969, was to discuss the terms for the acquisition by Associated of a one-third interest in Gulf.

During the course of the negotiations and in anticipation of Associated acquiring a one-third interest in Gulf, Associated advanced to Gulf as loans during the months of September, October, and November 1969, a total of $1,200,000 which was evidenced by three promissory notes.

The negotiations culminated in a written contract as of February 1, 1970, among petitioner, SCC, Gulf, and Associated.

Because the contract contemplated the issuance of preferred and common stock to Associated by Gulf, the articles of incorporation of Gulf were amended on February 27, 1970, to increase the corporation's authorized capital of 1 million shares of $10 par value stock to 1,020,000 shares consisting of 20,000 shares of $50 par value preferred stock and 1 million shares of $10 par value common stock.

On March 2, 1970, the closing of the transaction contemplated by the contract took place in Galveston, Tex.

At the closing, pursuant to the terms of the contract, several transactions took place, including the following:

(1) Associated purchased from Gulf 20,000 shares of Gulf preferred stock for $1 million and 20,000 shares of Gulf common

---

[2]However, Gulf was neither a source of supply nor a customer of petitioner. In fact, petitioner listed its Gulf stock as an investment on its books and Federal income tax returns.

stock for $1 million. The $2 million purchase price was paid at the closing as follows:

| | |
|---|---|
| Cancellation of the three promissory notes evidencing Gulf's indebtedness to Associated | $1,200,000.00 |
| Interest accrued on the above notes | 32,499.90 |
| Cash | 767,500.10 |
| | 2,000,000.00 |

(2) Petitioner and SCC each transferred 4,000 shares of Gulf common stock to Gulf as a capital contribution.[3]

(3) Petitioner and SCC transferred to Gulf as a capital contribution all operating assets relating to the joint venture, including, but not limited to, the real property owned by them in Ironton, Ohio, together with all fixed assets located in the Ironton plant.

(4) SCC paid $125,000 to Gulf as a capital contribution.

(5) Petitioner sold the Texas property to Gulf for $610,000.

(6) Gulf granted to SCC and petitioner options to purchase 3,000 and 1,000 shares of Gulf common stock, respectively, at $50 per share.

(7) The contract contained certain representations and warranties by the parties, including a representation and warranty by petitioner and SCC to Associated that the net worth of Gulf as of June 30, 1970, should not be less than $2,500,000. To secure compliance with such warranty and pursuant to the terms of the contract, petitioner delivered to Associated 18,000 shares of Gulf common stock and SCC delivered to Associated 14,000 shares of Gulf common stock.

The warranty provision in the contract, as amended, pertain-

---

[3]The certificates representing the 8,000 shares so contributed to Gulf by petitioner and SCC were subsequently canceled by Gulf on Mar. 2, 1970, leaving the following shares issued and outstanding at that time:

| | Common | Preferred |
|---|---|---|
| Petitioner | 18,000 | - |
| SCC | 14,000 | - |
| Associated | 20,000 | 20,000 |
| Total | 52,000 | 20,000 |

ing to Gulf's net worth on June 30, 1970, provided in part as follows:

3.10 The net worth of Gulf as at June 30, 1970 shall be not less than $2,500,000, as determined by a certified audit * * * . In the event of the breach of this representation and warranty:

(a) If the net worth of Gulf as at said date is $2,400,000 or more, SCC and Lenway shall each, at the respective option of each, within thirty days after the delivery of the said certified audit, either contribute to Gulf one-half of the amount of the difference between the net worth as at June 30, 1970 and $2,500,000, or, failing so to do, its right to the return of 2000 Common Shares of Gulf under 8.1 below, and the option granted to it by Gulf under 8.2 below and all its rights thereunder shall thereupon cease, terminate and come to an end.

(b) If the net worth of Gulf is less than $2,400,000, then SCC and Lenway shall each, at the respective option of each, within thirty days after the delivery of said certified audit, each [sic] either contribute to Gulf one-half of the amount of the difference between the net worth as at June 30, 1970 and $2,500,000, or, failing so to do, its right to the return of 2000 Common Shares under 8.1 below and the option granted it by Gulf under 8.2 below, and all its rights thereunder shall thereupon cease, terminate and come to an end, and, in addition, it shall at its option either (i) pay to Gulf as a capital contribution one-half of each deficiency or (ii) transfer to Gulf sufficient of its Common Shares at the book value thereof as at June 30, 1970 to equal for each one-half of the difference between the net worth of Gulf at June 30, 1970 and $2,500,000.[4]

Additionally, the contract expressly limited petitioner's liability under such warranty as follows:

The liability of SCC and Lenway for breach of any representation, warranty or covenant contained in this Agreement is limited to their Common Shares of Gulf, and nothing herein contained shall impose any personal liability upon either SCC or Lenway, and in no event shall a deficiency or other money judgment be rendered against either of them by reason of any such breach.

The contract also contained the following provisions:

8. *Further Covenants of Gulf*

8.1 If as at December 31, 1970, 1971 or 1972, the net worth of Gulf as determined by Price Waterhouse & Co., or any other nationally recognized certified independent public accountants, is $3,000,000 or more, Gulf shall return 2000 Common Shares each to SCC and Lenway of the Common Shares contributed to Gulf by them under 5.4.

8.2 Gulf shall, on the Closing Date, grant SCC and Lenway options to purchase 3000 and 1000 Common Shares of Gulf, respectively, at $50 per share,

---

[4]If one of the two corporations elected not to contribute one-half of such difference to Gulf, the other could contribute the full amount of such difference and receive a commensurate amount of Gulf stock from the noncontributing corporation.

which options, unless sooner terminated under 3.10 above, shall be exercisable by SCC and Lenway, respectively, until March 31, 1975, and if either SCC or Lenway does not exercise its option in full by said date, the other may exercise the balance until April 30, 1975.

On June 30, 1970, the net worth of Gulf was $1,625,981. Such amount was $874,019 less the $2,500,000 net worth warranted by petitioner and SCC pursuant to the contract.

In September 1970, petitioner was furnished a balance sheet which reflected a deficiency of $874,019 in the net worth of Gulf as at June 30, 1970. Petitioner was financially able to obtain the $437,010 in order to make its required contribution to Gulf and thus retain its stock ownership, but elected not to do so.

## OPINION

As a result of the transaction among petitioner, SCC, and Associated, petitioner's stock interest in Gulf terminated in 1970. It claimed an ordinary loss based on "abandonment" in the amount of $254,518.[5] Petitioner asserts that it is entitled to an ordinary loss under section 165(a) on the ground either (1) that there was no "sale" or "exchange," with the result that the limitation of section 165(f) does not apply, or (2) that its Gulf stock was not a capital asset under the principles enunciated in *Corn Products Co. v. Commissioner*, 350 U.S. 46 (1955), or (3) the loss of the shares resulted from a guaranty designed to promote Gulf's business "which contained what used to be an integral part of petitioner's business" (petitioner's opening brief, p. 31). Respondent disputes petitioner's contentions and urges that petitioner's loss should be treated as a capital loss. For the reasons which hereinafter appear, we agree with respondent.

We can readily dispose of petitioner's contention that its stock in Gulf was not a capital asset. Aside from the fact that the record herein is devoid of any probative evidence that the operations of Gulf were so integrally related to petitioner's operations as to bring it within the principles enunciated in *Corn Products Co. v. Commissioner, supra*, we are satisfied that

---

[5]The parties have stipulated that this is the measure of petitioner's loss, although the record does not reveal how this amount can be correlated with the figure of $236,095 shown on petitioner's tax return for the fiscal year ending Jan. 31, 1971, as its investment in Gulf as of the beginning of such year. It is also not clear from the record whether petitioner's claimed loss is limited to the 18,000 shares "abandoned" or includes the 4,000 shares contributed by petitioner to Gulf pursuant to the agreement with Associated. However, the parties have not made any argument relating to this point, and, in any event, it is without significance in view of the rationale for decision herein.

petitioner had a substantial investment motive in acquiring and holding its Gulf stock. Consequently, *Corn Products* is inapplicable and the stock constituted a capital asset in petitioner's hands. *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977).[6]

Greater difficulty is encountered in the resolution of petitioner's other two contentions. In large measure, such resolution involves charting a path to decision which takes into account the potential impact of several lines of cases dealing with issues comparable to those involved herein: (a) the loss of collateral given to secure a nonrecourse obligation (e.g., *Millar v. Commissioner*, 67 T.C. 656 (1977); *Fox v. Commissioner*, 61 T.C. 704, 714–715 and n. 7 (1974)); (b) fulfillment of guaranty obligations upon the termination of a taxpayer-shareholder's relationship with a corporation (e.g., *Federal Bulk Carriers, Inc. v. Commissioner*, 558 F.2d 128 (2d Cir. 1977), affg. 66 T.C. 283 (1976); *United States v. Keeler*, 308 F.2d 424, 432–434 (9th Cir. 1962); *Siple v. Commissioner*, 54 T.C. 1 (1970); *Santa Anita Consolidated, Inc. v. Commissioner*, 50 T.C. 536 (1968)); and (c) the transfer of shares by a shareholder where the benefits flowing therefrom inure directly to the corporation and only indirectly to the shareholder (e.g., *Smith v. Commissioner*, 66 T.C. 622, 647–650 (1976); *Downer v. Commissioner*, 48 T.C. 86 (1967)). Admittedly, the parties herein have not adopted such a broad perspective of the issues requiring resolution, but we are satisfied that such a perspective is appropriate if we are to dispose of these issues consistent with the view of the Ninth Circuit expressed in *United States v. Keeler, supra* at 434, that, in situations of this kind, the ultimate determination should be made "with reference not to hard and fast rules, but to the facts developed in each particular case." In short, the transaction should be viewed as a whole. See *Siple v. Commissioner, supra* at 10.

Turning now to the specifics of the transaction among petitioner, SCC, and Associated, it is clear that the warranty of Gulf's net worth at $2,500,000 as of June 30, 1970, was induced only in part by petitioner's hope for enhancement in the value of the Gulf shares which it retained—an element that, standing alone, might well be insufficient to preclude an ordinary loss

---

[6] See also *Bell Fibre Products Corp. v. Commissioner*, T.C. Memo. 1977–42.

deduction (see cases collected in *Smith v. Commissioner, supra,* and *Downer v. Commissioner, supra).* But there were further inducements to petitioner, not only in the form of the sale of its Texas plant facility to Gulf at a profit, which it properly reported as a capital gain,[7] but, more significantly, the right to the return of 2,000 of the shares petitioner contributed to Gulf, in the event that the net worth of Gulf was $3 million or more on December 31, 1970, 1971, or 1972, and an option to acquire an additional 1,000 shares (or 4,000 shares if SCC did not exercise the option given to it with respect to 3,000 shares) at $50 per share effective until March 31 (or April 30), 1975, unless sooner terminated because of the warranty provision. Insofar as the instant case is concerned, the essence of the transaction reflects the receipt by petitioner of contingent rights to increase its shareholder position in Gulf as the quid pro quo[8] for a contingent obligation to transfer additional shares to Gulf, the implementation of which obligation would result in a reduction (and, as it turned out, the elimination) of that position. Presumably, these contingent rights and obligations were equal in value. Cf. *United States v. Davis,* 370 U.S. 65 (1962); *Downer v. Commissioner, supra.*

We think that, properly viewed, the transaction had its origin in the 1970 agreement among petitioner, SCC, and Associated and that the implementation of the warranty undertaking should not be considered as a transaction separate from that agreement. Such a view justifies the conclusion that petitioner bargained for benefits for its undertakings to transfer its shares in Gulf, both initially and by way of implementation of the warranty which it gave, and that it should be considered as having agreed to transfer its Gulf stock in exchange for such benefits. Cf. *Gawler v. Commissioner,* 60 T.C. 647 (1973), affd.

---

[7]Petitioner's return for the fiscal year ended Jan. 31, 1971, showed an original cost of $766,550, less depreciation of $190,250, and a selling price of $610,000, or a profit of $33,700. The record contains two appraisals of the facility antedating petitioner's acquisition which indicate a fair market value substantially in excess of what petitioner paid and, ergo, substantially in excess of what it received on the sale of Gulf. But these appraisals were offered and received in evidence only for the purpose of showing that they were taken into account in the bargaining among petitioner, SCC, and Associated and not as evidence of value as such in early 1970.

[8]We think this inducing impact existed irrespective of whether petitioner and SCC, on the one hand, or Associated, on the other, wanted the March 1970 agreement. In this connection, we note that there is some evidence that the provision for the warranty of Gulf's net worth on the down side was generated by a demand by petitioner and/or SCC for an option to acquire additional shares if the hoped-for success of Gulf's operations had come to pass.

per curiam 504 F.2d 425 (4th Cir. 1974); sec. 1234. The facts that the implementation of the undertaking came at a later date and resulted in a termination of petitioner's interest do not require a different conclusion. Cf. *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952); see *Siple v. Commissioner, supra* at 11. The benefits inuring to petitioner were much more distinct and capable of measurement than was the situation in *Smith v. Commissioner, supra*. And clearly they created a situation quite different from that involved in deciding the tax treatment to be accorded an owner of property who allows it to be used to satisfy a nonrecourse obligation which it secures, such as existed in *Fox v. Commissioner, supra; Stokes v. Commissioner*, 124 F.2d 335 (3d Cir. 1941); *Polin v. Commissioner*, 114 F.2d 174 (3d Cir. 1940); and *Jamison v. Commissioner*, 8 T.C. 173 (1947), heavily relied upon by petitioner.[9] Similarly, these benefits go beyond the cases involving mere enhancement in value of a taxpayer's retained investment and make it unnecessary for us to elaborate on the distinction between stock surrendered to the issuing corporation and stock transferred to a third party.[10] See *Downer v. Commissioner, supra* at 91–92.

We are satisfied that, in the foregoing context, the arrangements among petitioner, SCC, and Associated "from start to finish were the embodiment of a capital transaction." See *Siple v. Commissioner, supra* at 10. Accordingly, on the facts herein, the transaction falls more within the ambit of *Federal Bulk Carriers, Inc. v. Commissioner, supra; United States v. Keeler, supra; Siple v. Commissioner, supra;* and *Downer v. Commissioner, supra,* than of *Fox v. Commissioner, supra; Smith v. Commissioner, supra;* and *Santa Anita Consolidated, Inc. v.*

---

[9]It is arguable whether these cases continue to have their original vitality in light of the subsequent decision of the Supreme Court in *Crane v. Commissioner*, 331 U.S. 1 (1947). See *Millar v. Commissioner*, 67 T.C. 656, 660–661 (1977). Cf. *Russo v. Commissioner*, 68 T.C. 135 (1977). But see *Fox v. Commissioner*, 61 T.C. 704, 715 n. 7 (1974), a case which involved an unusual set of circumstances.

[10]Petitioner transferred 18,000 shares to Associated as collateral for its warranty of net worth. The record is not clear as to whether, when petitioner decided to use these shares to implement its warranty obligation, the shares were retained by Associated or tranferred to Gulf in accordance with the provisions of the 1970 agreement that, under such circumstances, petitioner's obligation was to transfer the shares to Gulf, but, under our rationale herein, such lack of clarity is not significant.

*Commissioner, supra.* Such being the case, petitioner's entire loss is a capital loss.

*Decision will be entered for the respondent.*

Reviewed by the Court.
Scott, *J.,* dissents.

Fay, *J.,* dissenting: I cannot agree with the majority's reasoning and therefore respectfully dissent from its conclusion that the entire loss realized by petitioner as a result of the transactions which occurred in this case is a capital loss.

As the path charted by the majority is not a model of clarity, I believe it appropriate at this juncture to retrace its steps in order to point out where I believe the majority stumbled on its journey.

Under the majority's view, the proper conclusion or destination in this case, is that a sale or exchange of a capital asset (petitioner's Gulf stock) occurred, and the only loss involved was attributable to that sale or exchange. To reach this preordained destination, the majority begins by finding that petitioner's Gulf stock constituted a capital asset in its hands. Next, it reasons that the execution of the March 1970 contract constituted a sales agreement in which petitioner agreed to transfer its Gulf stock in consideration for certain benefits.[1] Finally, the majority interprets the subsequent transfer by petitioner of its Gulf stock in satisfaction of a warranty contained in the March 1970 contract as merely the delivery of the stock contemplated by the purported sales agreement. In other words, the majority broadly views these steps: the finding that petitioner's Gulf stock constituted a capital asset in its hands, a finding of consideration for petitioner's alleged promise to transfer its Gulf stock, and the actual transfer of such stock, as constituting a single integrated capital transaction in which petitioner sustained only a capital loss.

In my opinion, the majority's path to decision is no path at all. Rather, it merely represents an unrealistic attempt to oversim-

---

[1]See p. 627 of the majority opinion.

plify what is in fact a very complex factual situation. While the majority correctly characterizes petitioner's Gulf stock as a capital asset, I believe its finding that the March 1970 contract should be considered as an agreement by petitioner to transfer its Gulf stock in exchange for certain benefits is untenable.

First, as the trial judge in this case, having had the opportunity to consider the demeanor and credibility of the witnesses who testified, I am firmly convinced that the execution of the March 1970 contract was not contemplated by petitioner as a step in a master plan to dispose of its Gulf stock. To the contrary, I think the parties to the contract believed that Gulf would be a successful venture and that petitioner would retain its Gulf stock.

Secondly, the March 1970 contract contained no requirement that petitioner transfer its Gulf stock either to Associated or Gulf in any event. The only relevant obligation imposed upon petitioner under the contract was that if, as of June 30, 1970, the net worth of Gulf was less than $2,500,000, then petitioner was required to contribute one-half of such deficiency to Gulf. With respect to the mode of payment, petitioner had the option of contributing cash or Gulf stock at book value. This obligation was nonrecourse and secured by a pledge of petitioner's Gulf stock as collateral. Thus, on the date the March 1970 contract was executed, petitioner neither intended nor was obligated to transfer its Gulf stock.[2]

My third difficulty with the majority's finding that a sale or exchange of petitioner's Gulf stock is embodied in the March 1970 contract, concerns the majority's theory of consideration. Absent a foreclosure or other such "sale," consideration is a necessary element of a sale or exchange. *Smith v. Commissioner*, 66 T.C. 622 (1976); compare *Helvering v. Hammel*, 311 U.S. 504 (1941); *Russo v. Commissioner*, 68 T.C. 135 (1977).

The majority's theory of consideration is that "petitioner

---

[2]I am cognizant that the substance of a transaction rather than its form is determinative for Federal income tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Commissioner v. Court Holding Co.*,324 U.S. 331 (1945). In the present case, however, the execution of the contract and petitioner's mode of satisfaction of an obligation thereunder by the disposition of its Gulf stock, were each transactions of economic substance affecting the rights of both petitioner and Associated. Since the purpose of the contract was not the disposition of petitioner's Gulf stock, to be achieved through a series of closely related steps executed for tax avoidance purposes, it would be inappropriate to ignore the form adopted by the taxpayer. *Federal Bulk Carriers, Inc. v. Commissioner*, 558 F.2d 128 (2d Cir. 1977), affg. 66 T.C. 283 (1976).

bargained for benefits for its undertakings to transfer its shares in Gulf, both initially and by way of implementation of the warranty which it gave, and that it should be considered as having agreed to transfer its Gulf stock in exchange for such benefits." The benefits alluded to by the majority concern petitioner's sale of its Texas property to Gulf and certain contingent stock rights granted petitioner under the contract. However, a more careful analysis of the particular points upon which the majority relies, reveals that petitioner had no intention of transferring its Gulf stock in consideration for these benefits.

To begin, pursuant to the March 1970 contract, petitioner sold its Texas plant facilities to Gulf for $610,000. The majority would view the $610,000 not only as consideration to petitioner for the transfer of the Texas property, but also as consideration for an agreement by petitioner to transfer its Gulf stock. In support of this conclusion the majority relies on the fact that petitioner reported a profit of $33,700 from the sale of its Texas property on its Federal income tax return. This view is not only illogical but is contrary to the evidence presented.

Clearly, the $610,000 paid to petitioner represents consideration for the transfer of its Texas plant to Gulf. The relevant inquiry, however, is not whether petitioner made a profit on this sale, but whether any portion of the $610,000 paid for the property was in excess of the fair market value of the property on the date it was transferred. If, for example, the fair market value of the property was $500,000, the $110,000 excess ($610,000 minus $500,000) could be said to represent consideration for petitioner's transfer of its Gulf stock. However, there is no direct or indirect evidence to indicate that such is the case.[3] Absent such evidence, the $610,000 paid for the property should be presumed to equal its fair market value. See *Philadelphia Park Amusement Co. v. United States*, 126 F. Supp. 184 (Ct. Cl. 1954); cf. *United States v. Davis*, 370 U.S. 65 (1962). Since the $610,000 amount cannot be shown to have exceeded the fair market value

---

[3]Indeed, two appraisals received into evidence for the purpose of establishing the fact that they were considered during the negotiations between the parties to the March 1970 contract indicate a fair market value of the Texas plant facility of $3,832,700 in 1966 and $4,696,980 in 1968. The record also indicates that pursuant to a 1969 lease agreement between Gulf and petitioner, Gulf had an option to purchase the Texas property for $1 million in cash. In short, the best that can be gleaned from the record is that the fair market value of the Texas property exceeded $610,000 on the date it was sold to Gulf.

of the Texas property, I believe it error for the majority to designate some portion of this amount as consideration for petitioner's alleged promise to transfer its Gulf stock.

Next, the majority purports to find consideration for the exchange from petitioner's contingent right to the return of 2,000 of the 4,000 shares of Gulf stock that petitioner transferred to Gulf under the March contract, and from petitioner's contingent right to acquire an additional 1,000–4,000 shares of Gulf stock at $50 per share. I find this most confusing. It is true that petitioner transferred 4,000 shares to Gulf in March 1970 and could reacquire up to 6,000 shares of Gulf stock upon the occurrence of certain contingencies and the payment of up to $200,000. Under the majority's theory of consideration, however, petitioner transferred, under the March 1970 contract, its remaining 18,000 shares of Gulf stock in exchange for contingent rights to acquire 6,000 shares of the same stock at a cost of $200,000.[4] As such, the majority's theory simply makes no sense. Nor does it credit petitioner's officers or board of directors as having any business sense whatsoever. In fact, one officer-director of petitioner, who took part in the negotiation of the March 1970 contract, testified at trial and was found by the Court to be an astute businessman.

Furthermore, the majority's theory of consideration is inconsistent with its own result. There is no dispute between the parties that the aggregate amount of petitioner's loss was $254,518. Petitioner's basis in its Gulf stock was also $254,518. The majority indicates (on p. 627 of its opinion) that the consideration petitioner received for its 18,000 shares of Gulf stock was equal in value to such stock. Assuming, for purposes of illustration only, that the fair market value of petitioner's 18,000 shares of Gulf stock was $125,000, petitioner's loss on the disposition of such stock, under the majority's approach, would have been $129,518 ($254,518 basis minus $125,000 fair market value of consideration received) with no other loss being sustained. Of course, this is contrary to the majority opinion

---

[4]Neither party views the execution of the contract involved and the disposition of petitioner's Gulf stock as one overall transaction whereby the consideration received by petitioner upon the execution of the contract would also serve as consideration flowing to petitioner on the disposition of its Gulf stock.

which indicates that petitioner's realized loss was $254,518, as agreed by the parties.[5]

Based on the foregoing, I submit the majority's view of the March 1970 contract as an agreement by petitioner to sell or exchange its Gulf stock is erroneous, and its conclusion based on such view therefore wrong.[6]

In lieu of the majority's approach, I would view the payment by petitioner of its warranty obligation and the disposition of its Gulf stock as two transactions, each having its own tax consequences. While both transactions arise from the same contract, viewing them separately is not unusual. In many instances what appears to be one transaction is actually two separate transactions which happen to occur at the same time. For example, suppose a corporation, C, engages the services of an individual, I, as an employee for 1 week and pays I for his services with 10 shares of XYZ stock having a fair market value of $650 and a basis of $600 to C. Two transactions have occurred. First, C has made an exchange of its XYZ stock for I's services. Thus, C has realized a capital gain of $50 on the disposition of its XYZ stock. Secondly, C has incurred an ordinary and necessary business expense for I's salary and is entitled to a deduction equal to the fair market value of the stock ($650). The symmetry of this is illustrated by the fact that C began with a $600

---

[5]The only circumstance in which the majority's approach would be consistent with its own result would be to assign a fair market value of zero to petitioner's Gulf stock. This, of course, would be inconsistent with the record and would render the contract meaningless. If the majority opinion had also discussed petitioner's warranty or guarantee loss, it might have at least reached a result consistent with its own reasoning.

[6]I would also point out that the record in this case plainly demonstrates that neither the execution of the March 1970 contract, petitioner's warranty obligation thereunder, nor Associated's purchase of Gulf stock had anything whatsoever to do with petitioner's original acquisition of its Gulf stock. Therefore, United States v. Keeler, 308 F.2d 424 (9th Cir. 1962) and Siple v. Commissioner, 54 T.C. 1 (1970), heavily relied upon by the majority to support its finding of a single capital transaction, are inapposite. See Rietzke v. Commissioner, 40 T.C. 443 (1963); Shea v. Commissioner, 36 T.C. 577 (1961), affd. per curiam 327 F.2d 1002 (5th Cir. 1964); Condit v. Commissioner, 40 T.C. 24 (1963), affd. 333 F.2d 585 (10th Cir. 1964). In addition, I submit that the majority's reliance upon Federal Bulk Carriers, Inc. v. Commissioner, 588 F.2d 128 (2d Cir. 1977), affg. 66 T.C. 283 (1976), and Downer v. Commissioner, 48 T.C. 86 (1967), is likewise misplaced. In Federal Bulk Carriers, X purchased all the stock of Y from Z. The purchase price for the Y stock was to be adjusted subsequent to its sale by reference to the profitability of the underlying business sold. When the business subsequently failed to produce the anticipated profits, Z became obligated to make certain payments to X. The resulting loss was held to be a capital loss. In the present case, Associated purchased its Gulf stock from Gulf, not petitioner. Furthermore, any payments by petitioner under the warranty were to be made to Gulf, not Associated, and the warranty was given in conjunction with Associated's purchase of Gulf stock, not petitioner's sale of its Gulf stock. In Downer, we dealt with the question of whether an employee's continuation of his employment was consideration for a shareholder's transfer of stock in the corporation to the employee. I find these cases unhelpful in the present context.

investment, and as a result of the foregoing transactions, realized a $50 gain and is entitled to a $650 deduction. This approach is also in accordance with the decided cases. See, e.g., *Santa Anita Consolidated, Inc. v. Commissioner*, 50 T.C. 536 (1968).

As a further illustration of this principle, assume (for the purpose of this example only) that Lenway, as the result of a valid business transaction, became obligated under the warranty provisions of a contract between itself and Associated to pay Gulf $100,000. Assume further that the Gulf stock held by Lenway had a fair market value of $100,000 and a basis of $250,000 in Lenway's hands. Now, if Lenway sold its Gulf stock to an unrelated third party, X, for $100,000 and used the money to pay its warranty obligation, what should the result be? As in the first example, two transactions have occurred. First, Lenway has realized a $150,000 capital loss on the sale of its Gulf stock to X ($250,000 basis—$100,000 amount realized). Secondly, when Lenway pays the $100,000 to Gulf in satisfaction of its obligation to Associated, Lenway has realized an ordinary loss of $100,000—the amount of money paid. Thus, Lenway began with a $250,000 investment, realized a $150,000 capital loss on the sale of its Gulf stock to X, and an ordinary loss of $100,000 on payment of an obligation.

The only difference in the facts as they actually occurred in the case as opposed to the preceding illustration is that rather than selling its Gulf stock to a third party and paying Gulf with the proceeds, Lenway merely transferred the stock directly to Gulf. Admittedly it is conceptually more difficult to separate the two transactions where the identity of the transferee of the stock and the recipient of the warranty payment are one in the same. Nevertheless, the fact remains that two transactions have occurred and should be treated accordingly.

With respect to the loss realized by petitioner on the disposition of its Gulf stock, I too believe this constituted a sale or exchange resulting in a capital loss to petitioner, but for reasons which differ from the majority opinion. The majority holds that petitioner received consideration for a transfer of its Gulf stock in March via certain benefits under the contract. I believe that petitioner transferred its Gulf stock for consideration in September 1970, the consideration being the extinguish-

ment of a nonrecourse debt obligation created by the March 1970 contract.

It is well established that if a taxpayer is personally liable on a debt and transfers property to the creditor in satisfaction of that debt, the consideration that flows to the taxpayer is the cancellation of the debt and the transaction constitutes a sale or exchange. E.g., *Kaufman v. Commissioner*, 119 F.2d 901 (9th Cir. 1941), affg. a Memorandum Opinion of this Court; *Rogers v. Commissioner*, 103 F.2d 790 (9th Cir. 1939), affg. 37 B.T.A. 897 (1938), cert. denied 308 U.S. 580 (1939); *Unique Art Manufacturing Co. v. Commissioner*, 8 T.C. 1341 (1947); *Peninsula Properties Co. v. Commissioner*, 47 B.T.A. 84 (1942).

However, where the obligation is nonrecourse and the taxpayer abandons the underlying secured property or transfers it to the creditor (or to a third party at the direction of the creditor) in satisfaction of the obligation, it has not been clear, for the limited purpose of determining the presence of a sale or exchange, whether the taxpayer has received any consideration solely by virture of the satisfaction of the debt, since he was never personally obligated thereon.

In *Jamison v. Commissioner*, 8 T.C. 173 (1947), we held that a conveyance of land to the local municipalities involved for the delinquent real estate taxes thereon, which were not the personal obligation of the owner under the applicable State law, was not a sale or exchange. We based our decision on the premise that since the taxpayer was not personally liable for the real estate taxes, no consideration flowed to the taxpayer on the conveyance of the property. At the time, our decision was in accord with the view of other courts. See *Commissioner v. Crane*, 153 F.2d 504 (2d Cir. 1945), affd. on other grounds 331 U.S. 1 (1947); *Stokes v. Commissioner*, 124 F.2d 335 (3d Cir. 1941); *Polin v. Commissioner*, 114 F.2d 174 (3d Cir. 1940).

Shortly after our decision in *Jamison*, however, the Supreme Court handed down its landmark decision in *Crane v. Commissioner*, 331 U.S. 1 (1947). In Crane, the taxpayer by bequest, acquired an apartment building subject to an unassumed mortgage. Subsequently, the taxpayer sold the property to a third party, still encumbered, for a small amount of cash. The taxpayer contended that the small amount of cash was all she realized from the sale. In rejecting this contention and including the amount of the mortgage in the taxpayer's amount realized

under the predecessor to what is now section 1001, the Court observed:

we think that a mortgagor, not personally liable on the debt, who sells the property subject to the mortgage and for additional consideration, realizes a benefit in the amount of the mortgage as well as the boot. If a purchaser pays boot, it is immaterial as to our problem whether the mortgagor is also to receive money from the purchaser to discharge the mortgage prior to sale, or whether he is merely to transfer subject to the mortgage—it may make a difference to the purchaser and to the mortgagee, but not to the mortgagor. Or put in another way, we are no more concerned with whether the mortgagor is, strictly speaking, a debtor on the mortgage, than we are with whether the benefit to him is, strictly speaking, a receipt of money or property. We are rather concerned with the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations. If he transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another. [331 U.S. at 14; fn. refs. omitted.]

Subsequent cases dealing with the concept of "amount realized" under section 1001(b) have broadly construed this language in *Crane* to require inclusion of such indebtedness in the taxpayer's amount realized on the disposition of encumbered property. See, e.g., *Johnson v. Commissioner*, 495 F.2d 1079 (6th Cir. 1974), affg. 59 T.C. 791 (1973), cert. denied 419 U.S. 1040 (1974); *Teitelbaum v. Commissioner*, 346 F.2d 266 (7th Cir. 1965), affg. a Memorandum Opinion of this Court; *Parker v. Delaney*, 186 F.2d 455 (1st Cir. 1950), cert. denied 341 U.S. 926 (1951); *Millar v. Commissioner*, 67 T.C. 656 (1977); *Woodsam Associates, Inc. v. Commissioner*, 16 T.C. 649 (1951), affd. 198 F.2d 357 (2d Cir. 1952).

Nevertheless, the foregoing language utilized by the Supreme Court in *Crane* has not been interpreted until now as also establishing that a sale or exchange occurs solely upon the abandonment or transfer to the creditor of property pledged as security for a nonrecourse obligation. See *Fox v. Commissioner*, 61 T.C. 704, 715 (1974);[7] cf. *Parker v. Delaney, supra.* In fact, the opinion by the Second Circuit Court of Appeals in *Crane*,

---

[7] In *Fox v. Commissioner*, 61 T.C. 704, 715 (1974), we recently noted that generally the cases hold that no sale or exchange occurs under such circumstances. However, our holding in *Fox* was not predicated upon the continued validity of the cases cited for that general proposition. Rather, it was alternatively based on the fact that the taxpayer received no consideration on the disposition of certain stock as the obligation in that case was not canceled and no other consideration was received.

contains language to the contrary. See *Commissioner v. Crane, supra.*

In the present case, petitioner transferred a capital asset in satisfaction of a nonrecourse obligation. The amount of such obligation became fixed at an amount equal to the fair market value of petitioner's Gulf stock on the date petitioner notified Associated of its election not to transfer cash to Gulf.[8] It seems anomalous to me in light of the Supreme Court's decision in *Crane,* as subsequently applied by the courts, that such amount constitutes petitioner's "amount realized" under section 1001(b) on the disposition of its Gulf stock, but does not constitute consideration received by petitioner for purposes of the sale or exchange requirement of sections 1211 and 1222. Indeed, I find the distinction, if any, is without substance.[9]

Thus, in view of the foregoing and upon my reexamination of the basis of our decision in *Jamison,* I would conclude that the disposition of petitioner's Gulf stock in satisfaction of its warranty obligation to Associated was not without consideration and it therefore constituted a sale or exchange of such stock. Accordingly, I would no longer adhere to our opinion in *Jamison* to the extent that it is inconsistent with the views expressed herein. Apparently, the majority shares this view as it has effectively overruled *Jamison* on p. 628 of its opinion at n. 9. The matter does not end here, however.

With respect to the loss also sustained by petitioner on the satisfaction of its warranty obligation, respondent argued on brief that petitioner was not entitled to deduct such loss because it failed to establish a business relationship between itself and Gulf sufficient to entitle it to a deduction under section 165(a).

---

[8]As of June 30, 1970, petitioner had the option of transferring its Gulf stock or paying $437,010 in cash. In other words, the petitioner in this instance had the option of selecting the amount of its warranty obligation as $437,010 or a lesser amount equal to the fair market value of its Gulf stock. The amount of its obligation to Associated thus became fixed at an amount equal to the then fair market value of the stock when it elected to transfer such stock rather than become obligated to pay money and notified Associated accordingly. Therefore, the amount of petitioner's loss attributable to the disposition of its stock would be an amount equal to the difference between petitioner's adjusted basis in the Gulf stock and its fair market value on the date of disposition. See *United States v. General Shoe Corp.,* 282 F.2d 9 (6th Cir. 1960), cert denied 365 U.S. 843 (1961); *Santa Anita Consolidated, Inc. v. Commissioner,* 50 T.C. 536 (1968); cf. *Woodsam Associates, Inc. v. Commissioner,* 16 T.C. 649 (1951), affd. 198 F.2d 357 (2d Cir. 1952); *Parker v. Delaney,* 186 F.2d 455 (1st Cir. 1950), cert. denied 341 U.S. 926 (1951); Rev. Rul. 76–111, 1976–1 C.B. 214.

[9]Commentators have also questioned the validity of such a distinction. See M. Ginsburg, "The Leaky Tax Shelter," 53 Taxes 719, 723 (1975); R. Handler, "Tax Consequences of Mortgage Foreclosures and Transfers of Real Property to the Mortgagee," 31 Tax L. Rev. 193, 244 (1976). Respondent has apparently adopted this position. See Rev. Rul. 76–111, 1976–1 C.B. 214.

Section 165(a) provides, in general, for the deductibility of "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Petitioner realized a loss on the satisfaction of its warranty obligation to Associated under the relevant terms of the contract. The evidence clearly indicates that the contract creating such obligation arose in the course of petitioner's business as a transaction entered into by petitioner for profit. Petitioner had no right to compensation for its loss by insurance or otherwise.

Furthermore, the presence or absence of a business relationship between petitioner and Gulf has no bearing on the deductibility of its loss, as petitioner incurred the obligation on its own behalf and not as a guarantor of an obligation to Gulf. Thus, petitioner has met the requirements of section 165(a) regarding its warranty loss.

Accordingly, I would hold that the loss realized by petitioner ($254,518 minus fair market value of stock transferred), due to the transfer of a capital asset in payment of an obligation, constitutes a capital loss and petitioner's loss attributable solely to the satisfaction of its warranty obligation (the amount of that obligation—which in this case is the same as the fair market value of the stock transferred), constitutes an ordinary loss, deductible under section 165(a).

DRENNEN, DAWSON, and GOFFE, *JJ.*, agree with this dissent.