HENSEL PHELPS CONSTRUCTION CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10685-78, 11695-78. Filed July 31, 1980.

*Robert S. Rich, Herrick K. Lidstone,* and *Albert Theodore Powers,* for the petitioner.

*Jeff P. Ehrlich,* for the respondent.

FEATHERSTON, *Judge:* In these consolidated cases, respondent determined deficiencies in Federal income tax in the following amounts:

| Docket No. | FYE May 31— | Deficiency |
|---|---|---|
| 10685–78 | 1974 | $110,857 |
| 11695–78 | 1975 | 72,389 |
| | 1976 | 2,314 |

Concessions having been made, the issues remaining for decision are:

(1) Whether petitioner received a partnership interest in exchange for services rendered in the tax year ended May 31, 1974; and

(2) Alternatively, whether respondent correctly allocated income in the tax years in question from the partnership to petitioner under section 482.[1]

## FINDINGS OF FACT

At the time of filing its petition, petitioner Hensel Phelps Construction Co.'s principal place of business was located at Greeley, Colo. Petitioner and its wholly owned subsidiaries, Clearwater Hydromech Corp. (Clearwater) and Stone Bridge Cellars, Inc. (Stone Bridge), filed a consolidated Federal income tax return for the tax year ended May 31, 1974, with the Internal Revenue Service Center, Ogden, Utah. Petitioner and its wholly owned subsidiaries, Clearwater, Stone Bridge, and Clearwater Constructors, Inc. (Constructors), filed consolidated Federal income tax returns for the tax years ended May 31, 1975, and May 31, 1976, with the Internal Revenue Service Center, Ogden, Utah. During the years in issue, petitioner and its subsidiaries reported their income on the accrual method of accounting, except that income from long-term contracts com-

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

menced before June 1, 1973, was reported on the percentage-of-completion method of accounting, and income from long-term contracts commenced after May 31, 1973, was reported on the completed contract method of accounting.

Petitioner is engaged in the general contracting business primarily as a prime contractor to private and public owners. Prior to 1972, petitioner's operations were limited to jobs for which petitioner competitively bid. In early 1972, petitioner hired John C. Todd (Todd) to secure negotiated contract projects in which petitioner would acquire an equity interest. During late April or early May 1972, Todd met with Louis Bansbach (Bansbach), Peyton Perry (Perry), and Donald Macy (Macy) (hereinafter collectively referred to as the individual owners) to discuss jointly developing real estate. On or about May 5, 1972, the individual owners jointly entered into a contract to purchase 5.6 acres of undeveloped land in Glendale, Colo., for $731,160 from sellers unrelated to petitioner or the individual owners. The individvual owners completed the purchase of the land on or about September 1, 1972.

After several meetings, petitioner and the individual owners agreed to study the feasibility of constructing an office building on the land purchased by the individual owners. This agreement was reduced to writing by letter dated July 6, 1972, to petitioner from the individual owners. That letter provided, inter alia:

This will confirm our oral understanding and serve as a letter of intent to guide our joint activities prior to consummation of a joint venture agreement. We have preliminarily agreed to form a joint venture depending upon satisfactory feasibility studies to develop the site into an office complex which may consist of one or more buildings to be constructed in several phases. We would contribute our contract to purchase the site to the joint venture and you would contribute your contractor's fee (profit and overhead) to the joint venture. Based upon these contributions we would each own 50% of the joint venture.

\* \* \* \* \* \* \*

It is our understanding that you have agreed to spend up to $20,000 beginning at once for the initial feasibility studies and planning. This would include, among other things, a proposed design of the project, site planning, space planning, suggested types of construction, estimated construction costs and preliminary drawings, and schematic designs. At the earliest practical date after your acceptance of this letter, we will jointly select the design and planning team. Copies of all drawings, maps and other data will be made available to both of us for inspection and copying at any reasonable time.

The timely completion of the feasibility studies and entering into a formal

joint venture agreement are critical to all of us as well as the viability of the project. Therefore, we believe it would be desirable to set forth some target dates. We feel the feasibility studies should be completed by September 10, 1972 and the execution of a joint venture agreement should be done by October 10, 1972. If we elect to terminate this letter of intent for any reason prior to October 10, 1972, we will reimburse you for all of your out-of-pocket expenses paid to outside parties up to $20,000 for work which we have mutually authorized to be done on this project. In addition to the actual expenses, we will pay to you an amount of 10% of said expenses as administrative overhead.

It has been a pleasure to discuss this project with you and we are looking forward to a mutually satisfactory venture.

On July 10, 1972, Todd endorsed the letter on behalf of petitioner and returned it to the individual owners. On the same day, the individual owners organized Bansbach, Perry & Macy, Inc. (BPM, Inc.), a Colorado corporation wholly owned by the individual owners in equal shares. Subsequent to the date of the letter, petitioner and the individual owners jointly selected and petitioner financed the hiring of various engineers, architects, and consultants to assist in the initial feasibility studies and planning for the construction of an office complex on the land. The individual owners did not exercise their right to terminate the agreement by October 10, 1972, as provided for in the July 6, 1972, letter. Additionally, the parties did not, as was contemplated in the letter, execute a joint venture agreement by October 10, 1972, because they were unable to arrange financing by that date.

By letter dated April 27, 1973, petitioner and the individual owners received a proposal from General Electric Credit Corp. of Colorado (G.E. Credit) to provide a combination construction and permanent mortgage loan in the amount of $6,200,000. The letter was addressed to Cherry Creek Plaza Associates (CCP Associates), described as a general partnership consisting of petitioner and the individual owners. Pursuant to the terms of the letter, petitioner paid $20,000 to G.E. Credit as a deposit to cover G.E. Credit's expenses in making the loan.

On May 2, 1973, petitioner and the individual owners conditionally agreed upon arrangements to develop the office complex. This agreement was reduced to writing by letter dated May 3, 1973, to petitioner from the individual owners. That letter provided, inter alia:

This will confirm our understanding of the agreements reached between

your company and us regarding the project referred to above during the meeting held in our office yesterday.

1. *Entity and Interest.* We will proceed at once to form an appropriate entity, probably a limited partnership with HPCC [petitioner] and each of us or our corporation as general partners. We will contribute to the partnership our equity in the 5.6 acres on the east side of Cherry Street and HPCC will contribute its contractor's profit and overhead for building the first proposed office building. HPCC will be entitled to one-half of the profits, losses and capital of the partnership and we will be entitled to the other one-half. Any parties to the entity other than HPCC and us will be admitted only as limited partners.

\* \* \* \* \* \* \*

5. *Expenses.* HPCC will advance all expenses which have been and which will continue to accrue until satisfactory financing is obtained and such amounts can be reimbursed to HPCC. If satisfactory financing is not obtained or if the first building is not constructed, the HPCC shall be reimbursed for 110% of its out-of-pocket expenses from the profit in the 5.6 acres at such time as the profit is realized. Any additional profit realized after payment to HPCC shall accrue solely to us.

6. *Liability.* It is agreed we have a substantial equity in the land which we are contributing to the partnership and we will pledge our interests in the partnership to HPCC as collateral for any advances made on our behalf. Therefore, it is understood that we will not be personally liable for making any cash contributions to the partnership nor for repayment of any advances made by HPCC on our behalf whether such advances are made to the partnership or to third parties for project expenses.

We are pleased to be partners with you in this project and look forward to a mutually satisfactory and successful venture.

The letter was approved the following day by Todd on behalf of petitioner.

Petitioner and CCP Associates, as the owner of the property, entered into a contract for the construction of the office building. The contract, which described CCP Associates as a limited partnership, stated on its face that it was effective as of May 1, 1973. Although the contract apparently was executed by Perry on behalf of BPM, Inc., described as a general partner of CCP Associates, and by Todd on behalf of petitioner, no date accompanied their signatures. Moreover, a clause in the contract stated that "the Guaranteed Maximum Cost includes the cost of all standard tenant finish work as defined in HPCC's Estimate dated August 10, 1973 but does not include the cost of any additional tenant finish work." The contract provided that the maximum cost of the project would not exceed $4,543,878, and that the building would be substantially completed by September 1, 1974.

Petitioner commenced construction of the office building prior to June 1, 1973, and had incurred costs of $68,368, including the initial feasibility studies and the $20,000 paid to G.E. Credit. Petitioner also had entered into various subcontracts and purchase agreements for the project by June 1, 1973.

G.E. Credit sent a letter, dated July 5, 1973, to CCP Associates committing itself to lend $6,400,000. The commitment letter described CCP Associates as a "limited partnership whose general partners are" petitioner and BPM, Inc. The letter provided, among other things, that the borrower should furnish "a true copy of the Borrower's partnership agreement" and "Evidence that Borrower is a corporation or partnership in good standing and existing under the laws of the State of Colorado." On July 20, 1973, the letter was accepted and approved by Macy as borrower, petitioner as general partner, and BPM, Inc., as general partner. In accordance with the terms of the letter, petitioner paid a $64,000 commitment fee to G.E. Credit on behalf of CCP Associates.

Petitioner, the individual owners, and BPM, Inc., entered into an agreement of limited partnership, entitled CCP Associates, dated August 1, 1973, and executed by them on August 7, 1973. The agreement listed petitioner and BPM, Inc., as general partners, and petitioner and Bansbach, Perry, and Macy as limited partners. The agreement provided in part that:

*Initial Contributions.* The individual Limited Partners, Bansbach, Perry and Macy, shall contribute to the partnership their equity interest in the said 5.6 acres of land. The land shall be conveyed to the partnership subject to the existing indebtedness which is secured only by the land and neither the partnership nor any of the partners shall personally assume any of the said indebtedness. The partnership shall reimburse Bansbach, Perry and Macy for their initial principal investment in the land in the amount of $48,235.75 plus the amounts of interest, taxes, insurance premiums, soil testing and all other direct costs of the land paid by said individuals since September 1, 1972. For purposes only of the initial entries on the books of the partnership, the said individuals shall be deemed to have transferred property to the partnership with an agreed value of $300 or $100 on behalf of each such individual. HPCC shall initially contribute $300 to the partnerrship as a Limited Partner.

The agreement further provided that petitioner would advance the first $300,000 cash needed, and that petitioner and the individual owners would each provide one-half of any additional cash needed. Additionally, the agreement provided that operating profits were to be divided as follows:

Petitioner as general partner ....................... 5 percent
BPM, Inc., as general partner ...................... 5 percent
Petitioner as limited partner ...................... 45 percent
Bansbach as limited partner ...................... 15 percent
Perry as limited partner ........................... 15 percent
Macy as limited partner ........................... 15 percent

The net losses were to be allocated as follows:

Petitioner as general partner ....................... 5 percent
BPM, Inc., as general partner ...................... 5 percent
Petitioner as limited partner ...................... 75 percent
Bansbach as limited partner ....................... 5 percent
Perry as limited partner ........................... 5 percent
Macy as limited partner ........................... 5 percent

The agreement further provided that:

The net gain resulting from the sale or other disposition of the northerly parcel of land as described on Exhibit A and the improvements thereon shall be allocated first to * * * [petitioner], as a Limited Partner, to the extent of the aggregate amount of net losses in excess of 45% which had been allocated to * * * [petitioner] under the provisions * * * [allocating net losses.] Any excess net gain not used in the disproportionate allocation to * * * [petitioner] under this subparagraph * * * shall be allocated among all partners in accordance with their shares of net operating profit set forth in subparagraph (a) * * * [providing for division of net operating profits]

On August 8, 1973, a certificate of limited partnership for CCP Associates was recorded in Arapahoe County, Colo., which certified, among other things, that the individual owners each had contributed to the partnership an undivided one-third equity interest in the land. Subsequently, on April 8, 1976, the partnership agreement was amended to reflect certain address changes and a $30,000 contribution to equity by petitioner.

G.E. Credit and CCP Associates closed the $6,400,000 loan on August 7, 1973, and CCP Associates gave G.E. Credit its promissory note in that amount. CCP Associates paid petitioner $212,100 for construction costs incurred from May 1, 1973, through July 31, 1973, $149,628 as reimbursement for payments made to architects and consultants from July 1972 through July 31, 1973, and $84,000 as reimbursement for payments to G.E. Credit in May and July 1973. CCP Associates also paid the individual owners $48,235.75.

The books and records of CCP Associates reflect petitioner's contributions to the partnership's capital as follows:

| Date of contribution | Amount |
|---|---|
| 1973 | $300 |
| 1975 | 300,000 |
| 1976 | 30,000 |

CCP Associates filed Federal partnership returns of income for the years August 1, 1973, through December 31, 1973, 1974, 1975, and 1976. No partnership return for CCP Associates was filed for any period prior to August 1, 1973. The partnership return for the period August 1, 1973, to December 31, 1973, states that business commenced August 1, 1973. The partnership return for 1974 shows that depreciation deductions on buildings, furniture and fixtures, elevators, and tenant finishing were claimed beginning August 1, 1974. Prior to January 1, 1973, no income was earned or deductible expenses incurred with respect to the project.

Petitioner's gross profits from construction contracts as percentages of its gross revenues during the 5 fiscal years ended May 31, 1976, were as follows:

| FYE May 31— | Percentage |
|---|---|
| 1972 | 6.75 |
| 1973 | 4.67 |
| 1974 | 3.37 |
| 1975 | 4.96 |
| 1976 | 7.03 |

Neither BPM, Inc., nor any of the individual owners had any interest, either directly or indirectly, in petitioner.

In the notice of deficiency issued to petitioner, respondent made the following determination:

It is determined that during the taxable year ended May 31, 1974, you received a partnership interest in exchange for services in connection with the construction of Cherry Creek Plaza. It is further determined that the fair market value of the partnership interest received by you is $239,151.00, which figure is equivalent to the value of the services exchanged. The value of the partnership interest received by you is includable in your gross income under section 61 of the Internal Revenue Code. Therefore, your taxable income is increased by the amount of $239,151.00.

Alternatively, respondent allocated additional income to petitioner under section 482 for the taxable year ended May 31, 1974.

OPINION

The three individuals who owned the 5.6-acre tract of land had a substantial equity interest in the land and agreed to contribute it to a partnership to be formed with petitioner. As its contribution, petitioner agreed to construct at cost an office building on the land. Petitioner was to own a 50-percent capital interst in the partnership, and the three individuals were to own the other 50 percent. After considerable planning and negotiations, the parties executed a formal partnership agreement. The first issue is whether petitioner received a capital interest in the partnership in exchange for its services before or after the close of its fiscal year ended May 31, 1973.

Petitioner does not dispute that the performance of services in exchange for a partnership capital interest generally is a taxable event under section 61. See sec 1.721–1(b)(1), Income Tax Regs.[2] Cf. *United States v. Frazell*, 339 F.2d 885 (5th Cir. 1964), cert. denied 380 U.S. 961 (1965). Petitioner contends, however, that the partnership was created, and an interest transferred to petitioner, in the fiscal year ended May 31, 1973, a year which is not before the Court. Respondent, to the contrary, argues that the formation of the partnership occurred during the fiscal year ended May 31, 1974, a year which is before the Court. Although this issue is difficult, we find for respondent.

The term "partnership," as used in the tax laws, is "broader in scope than the common law meaning of partnership, and may include groups not commonly called partnerships." Sec. 1.761–1(a), Income Tax Regs. Conversely, an enterprise which is a partnership under local law may fail to qualify as such for Federal tax purposes. *Commissioner v. Tower*, 327 U.S. 280, 287–288 (1946). In *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949), the Supreme Court stated that a partnership exists for Federal tax purposes if "considering all the facts * * * the

---

[2]Sec. 1.721–1(b)(1), Income Tax Regs., provides in part:

"The value of an interest in such partnership capital so transferred to a partner as compensation for services constitutes income to the partner under section 61. The amount of such income is the fair market value of the interest in capital so transferred, either at the time the transfer is made for past services, or at the time the services have been rendered where the transfer is conditioned on the completion of the transferee's future services. The time when such income is realized depends on all the facts and circumstances, including any substantial restrictions or conditions on the compensated partner's right to withdraw or otherwise dispose of such interest."

parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."

The issue is basically factual. In exchange for petitioner's completed services and promised future services in constructing the office building complex, petitioner received a 50-percent interest in the partnership. A careful review of the numerous documents introduced in evidence in light of the testimony convinces us that petitioner did not acquire its capital interest in the partnership until August 1, 1973. As of that date, the partnership was created and capitalized by the transfer of the land. Under section 1.721–1(b)(1), Income Tax Regs., petitioner realized taxable income at that time.

Petitioner makes several alternative arguments to support its contention that a partnership was formed, and petitioner received its 50-percent interest, not later than May 31, 1973. First, petitioner contends that the letter of July 6, 1972, and related facts show that a partnership had been created and an interest transferred to petitioner by that date. Petitioner observes that Todd, Perry, and Macy testified that they believed that a partnership had been created between petitioner and the individual owners by July 6, 1972. Further, they held themselves out to others as partners, and pursuant to the agreement contained in the July 1972 letter, jointly selected the consultants and engineers to complete the feasibility studies.

Contrary to petitioner's argument, however, the terms of the July 1972 letter indicate that the intent of the parties at that time was to eventually enter into a joint venture depending upon the successful completion of the preliminary studies and attempts to secure financing. The letter itself states that:

> This will confirm our oral understanding and serve as *a letter of intent* to guide our joint activities *prior to consummation of a joint venture agreement.* We have *preliminarily* agreed to form a joint venture depending upon satisfactory feasibility studies to develop the site into an office complex which may consist of one or more buildings to be construced in several phases. We would contribute our contract to purchase the site to the joint venture and you would contribute your contractor's fee (profit and overhead) to the joint venture. Based upon these contributions we would each own 50% of the joint venture. [Emphasis added.]

Thus, the language of the letter indicates that the parties merely anticipated the formation of a joint venture and did not actually enter into one at that time. Clearly, by July 6, 1972, petitioner had no proprietary interest in the capital or profits of

the alleged partnership. At the discretion of the individual owners, the letter of intent could be revoked and petitioner would be entitled to reimbursement only for 110 percent of its costs up to $20,000 rather than a share of partnership property. Hence, by July 1972, there was no intent "to join together in the present conduct of the enterprise." *Commissioner v. Culbertson, supra* at 742; cf. *S. & M. Plumbing Co. v. Commissioner,* 55 T.C. 702, 707 (1971); *Podell v. Commissioner,* 55 T.C. 429, 431 (1970).

Petitioner's second contention is that, even if the July 1972 letter did not create a joint venture, petitioner's partnership interest vested on October 10, 1972. On that date, petitioner argues, the individual owners' right to terminate the arrangement lapsed in accordance with the terms of the July 1972 letter. It is true that the July 1972 letter provided for an election by the individual owners to terminate the letter of intent at any time prior to October 10, 1972, and contained no provision for terminating the agreement after that date. Nevertheless, the lapse of that right to an election to terminate the arrangement did not in itself create a partnership. The July 1972 letter also provided that by October 10, 1972, the parties would enter into a joint venture agreement. Because of the lack of financing, however, this was not done. Thus, as we interpret the July 1972 letter, it merely set forth the intent of the parties to enter into a joint venture by October 10, 1972. As stated in the letter, the dates for taking various steps were "target dates." The letter did not stipulate that a joint venture would come into being unless the individual owners exercised their right to terminate the arrangement by October 10, 1972.

The letter of May 3, 1973, from the individual owners to petitioner supports this interpretation. In that letter, the parties specified the form of the entity under which they intended to do business. Pursuant to the provisions of that letter, if the project was canceled, however, petitioner would still be entitled only to reimbursement for 110 percent of its costs. Petitioner did not have an equity interest in the land or an interest in the capital of a partnership. Moreover, the letter stated that the parties "will proceed at once to form" a partnership. This anticipatory language indicates that no partnership existed as of May 3, 1973. The terms of the partnership agreement were still to be negotiated. Thus, it is clear that a partnership between petition-

er and the individual owners was not created on October 10, 1972, or even on May 3, 1973.

Petitioner alternatively contends that by October 10, 1972, it had received an undivided 50-percent interest in the land in exchange for its agreement to construct a building upon that land. The evidence, however, supports the contrary conclusion. As previously discussed, the only rights given to petitioner by the letters of June 6, 1972, and May 3, 1973, were to receive 110 percent of costs incurred in the preliminary work done on building the complex. Those letters did not give petitioner any interest in the land upon which the building was to be constructed. Indeed, the limited partnership agreement dated August 1, 1973, provided that the individual owners were contributing their interest in the land to the partnership. No mention was made of the contribution by petitioner of an interest in the land. If petitioner had owned an interest in the land prior to August 1, 1973, we think the partnership agreement would have reflected that fact. It did not do so, and we conclude that petitioner had no equity interest in the land or capital interest in the partnership prior to May 31, 1973.

Petitioner also argues that the enterprise was a "classic sharing arrangement" and thus petitioner is not subject to Federal income taxes. Citing Rev. Rul. 77–176, 1977–1 C.B. 77, petitioner contends that "a party to a sharing arrangement does not recognize income on its contribution of services in exchange for an interest in the property to which the services are rendered." That revenue ruling, however, deals only with the applicability of the "pool of capital" theory in cases concerning the developing and leasing of oil and mineral property. See G.C.M. 22730, 1941–1 C.B. 214. The ruling does not override the general principle, recognized by petitioner, that an interest in partnership capital received in exchange for services constitutes income. Cf. *Bryant v. Commissioner*, 46 T.C. 848, 855–862 (1966), affd. 399 F.2d 800 (5th Cir. 1968).

It is true that some of the documents dated prior to May 31, 1973, refer to CCP Associates as a partnership. For example, a letter dated April 27, 1973, from G.E. Credit was addressed to CCP Associates, a general partnership. In addition, petitioner and CCP Associates entered into a construction contract stated to be effective May 1, 1973. Nevertheless, these documents do not show that petitioner acquired a capital interest in a

partnership prior to May 31, 1973. The May 3, 1973, letter endorsed by the parties, which is dated after the G.E. Credit letter and the construction contract, indicates that no partnership had been formed at that time. Further, Todd testified in connection with the dates of the documents that "many things were done for the benefit of the lender." Thus, because G.E. Credit required the borrower to be a valid corporation or partnership, petitioner and the individual owners may have represented themselves as partners during the preliminary negotiations in order to assist in processing the papers required to secure financing. In addition, although the construction contract was dated May 1, 1973, a clause in it referred to an estimate prepared August 10, 1973, indicating that the May 1, 1973, date was not the date it was signed. Todd also admitted that the date of the contract was probably incorrect. Consequently, we do not think these documents support a finding that a partnership existed prior to May 31, 1973.

We think that the partnership was created when the parties entered into a limited partnership agreement dated August 1, 1973. Although in 1972 the parties intended to eventually enter into a partnership to construct an office complex, the project depended upon the completion of feasibility studies and the acquisition of financing. Financing was not secured until July 5, 1973, when G.E. Credit committed itself to make the loan. The loan was accepted on July 20, 1973, and shortly thereafter, the partnership agreement was executed. Until that time, petitioner had no proprietary or capital interest in the partnership which was to own the real property. The earliest partnership return that was filed in connection with the project was for the year August 1, 1973, through December 31, 1973. That return stated that business commenced August 1, 1973. Additionally, the partnership agreement stated that the individual owners' contribution was their interest in the land. If, as petitioner contends, they were actually exchanging their interests in a previously created general partnership for limited partnership interests, we think the agreement would have reflected that fact. Thus, we conclude that the partnership was created, and petitioner received its partnership interest in exchange for the services it was to perform, during the tax year ended May 31, 1974.

Assuming, arguendo, that a partnership arrangement between petitioner and the individual owners was such that

petitioner received a 50-percent interest during the tax year ended May 31, 1973, we nevertheless reject petitioner's conclusion that the taxable event occurred in that year rather than the year ended May 31, 1974. Under section 83,[3] property received for services must be included in income, to the extent that the fair market value of the property exceeds the amount paid for the property, in the year that the rights to the property are transferable or not subject to a substantial risk of forfeiture. As defined by section 83(c),[4] a right is subject to a substantial risk of forfeiture when the right "to full enjoyment of such property * * * [is] conditioned upon the future performance of substantial services by any individual." Moreover, if the rights of a transferree are subject to a substantial risk of forfeiture, the rights are not transferable. Sec. 83(c).

Here, until the parties executed the partnership agreement dated August 1, 1973, the land was the property of the individual owners and not the partnership. Whatever rights petitioner might have had in the whole arrangement were subject to a substantial risk of forfeiture because the individual owners could terminate the agreement and liquidate those rights by paying petitioner 110 percent of its costs rather than a share of partnership property. Similarly, although no evidence on the

---

[3] SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

[4] SEC 83(c). SPECIAL RULES.—For purposes of this section—

(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's right to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

(2) TRANSFERABILITY OF PROPERTY.—The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture.

point has been introduced, we infer that if petitioner could have transferred its rights prior to August 1, 1973, the transferee would have been subject to the same substantial risk of forfeiture as was petitioner. Thus, any rights held by petitioner in the enterprise prior to the execution of the partnership agreement were also nontransferable within the meaning of section 83(c)(2).

At the time the August 1, 1973, partnership agreement was signed, the building obviously had not been completed. From the information contained in the 1974 partnership return, the building was not completed until August 1, 1974, the date as of which the first depreciation deductions were taken. Nevertheless, as we read the partnership agreement, petitioner's right to a capital interest in the partnership was not "conditioned," within the meaning of section 83(c)(1), on the completion of the building. Rather, petitioner was obligated to complete the construction of the building by the separate construction contract into which it had entered. Petitioner's rights in the partnership became vested upon the execution of the partnership agreement and the immediately subsequent transfer of the land to the partnership. Thus, within the meaning of section 83(c), petitioner's partnership interest was transferable or not subject to a substantial risk of forfeiture after August 1, 1973.[5] Consequently, pursuant to section 83, the taxable event occurred during the tax year ended May 31, 1974, rather than during the previous year.

Petitioner also disputes the value of the partnership interest determined by respondent. Petitioner apparently contends that the value of the interests in the land contributed by the individual owners did not exceed the $300 that each owner was credited with in the partnership's capital account. Petitioner also observes that it lent the partnership large sums of money. Hence, it concludes that the value of the partnership interest

---

[5]Under the terms of that agreement, although petitioner could transfer its 5-percent general partner interest only with the written consent of the other general partner, it could transfer its 45-percent limited partner interest subject only to the right of first refusal by the other limited partners. The agreement further provided that petitioner was responsible for contributing funds to the partnership to the extent necessary, up to a maximum of $300,000. If petitioner failed to do this, then the other partners could, among other things, sell petitioner's interest, pay off the partnership obligations which were due, and return any remaining amount to petitioner. This does not constitute a substantial risk of forfeiture within the meaning of sec. 83.

which it received did not exceed the amount petitioner paid for the interest. We disagree.

We think it clear that the value of the unimproved land far exceeded the $900 that petitioner implies it was worth. The land had been purchased in 1972 for $731,160. In the May 3, 1973, letter, quoted in part in our findings, signed by the three individual owners and approved on behalf of petitioner, it is stated that: "It is agreed we have a substantial equity in the land which we are contributing to the partnership." For that reason, the individual owners were to be relieved of making cash contributions to the venture. Indeed, Macy testified that the $300 figure was an arbitrary nominal sum.

Petitioner's contention that it paid in full for the value of the partnership interest it received because it lent the partnership money is without merit. The value of the partnership interest that petitioner received is difficult to determine. There is no dispute, however, that petitioner and the individual owners dealt at arm's length. Thus, presumably, the value of the interest petitioner received equaled the value of petitioner's construction services in addition to the value placed upon petitioner's loans to the partnership. Cf. *United States v. Davis*, 370 U.S. 65, 72 (1962); *Estate of O'Nan v. Commissioner*, 47 T.C. 648, 663–664 (1967). In other words, the value of the construction services are presumed to be equal to the value of the partnership interest that petitioner received in excess of the value placed upon petitioner's loans. Thus, petitioner is taxable upon this amount, which represents the fair market value of petitioner's partnership interest in excess of the amount paid for it by petitioner. See secs. 1.721–1(b)(1) and 1.83–1(a), Income Tax Regs.

Respondent determined that amount by computing the value of the construction services petitioner rendered to the partnership. Petitioner's average profit margin for the 5 years ended May 31, 1976, was 5.36 percent. Respondent divided the total construction cost of the project[6] by 0.95 to yield the hypothesized

---

[6]Respondent used the amount of $4,543,878 as the actual cost of the project. Such amount was listed in the construction contract bearing the date of May 1, 1973, as the maximum cost of the project. Petitioner has not argued that the actual costs were less than this amount. Because petitioner's right to a partnership interest vested as of Aug. 1, 1973, the date of the creation of the partnership, we think that is the appropriate valuation date. The building had not been completed on that date, but the partnership held a favorable contract calling for its construction at cost with no profit to petitioner. Theoretically, the determined value should be

gross revenue that petitioner would have received if it had received a profit margin of 5 percent. The difference between the hypothesized gross revenue and the actual cost is the value of the services that petitioner contributed to the partnership in exchange for his partnership interest. We do not find that respondent's computation is erroneous.[7]

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

discounted for the 1-year time lag between the valuation date and completion of the building, but petitioner has not so contended and has offered no evidence on which a discount should be based.

[7]Because of our holding, we do not reach respondent's alternative argument that sec. 482 is applicable here.